NATIONAL LABOR RELATIONS BOARD, Petitioner,

and

Lay Faculty Association, Local 1261, Intervenor,

v.

BISHOP FORD CENTRAL CATHOLIC HIGH SCHOOL, Respondent.

No. 859, Docket 79–4166.

United States Court of Appeals, Second Circuit.

Argued March 20, 1980.

Decided June 17, 1980.

---

Charles P. Donnelly, Washington, D. C. (N. L. R. B., Paul J. Spielberg, Norton J. Come, John E. Higgins, Jr., Robert E. Allen, Elliott Moore, Washington, D. C., of counsel), for petitioner.

Jeffrey S. Karp, New York City (James R. Sandner, New York City, of counsel), for intervenor.

Kevin J. McGill, New York City (Clifton, Budd, Burke & DeMaria, Robert A. Wiesen, New York City, of counsel), for respondent.

Before LUMBARD, MULLIGAN and OAKES, Circuit Judges.

MULLIGAN, Circuit Judge:

The dispositive issue raised by this application for enforcement of orders of the National Labor Relations Board (the Board) is whether Bishop Ford Central Catholic High School (Ford Central) is subject to the jurisdiction of the Board. On May 15, 1978 the Board found that Ford Central had violated sections 8(a)(1), (3) and (5), 29 U.S.C. §§ 158(a)(1), (3) and (5), of the National Labor Relations Act (the Act) by refusing to recognize the Lay Faculty Association (the Union) as the representative of its lay faculty, 236 NLRB No. 3. On March 21, 1979, the Supreme Court in *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (affirming the Seventh Circuit's decision, 559 F.2d 1112 (1977)) held that the Board lacked statutory jurisdiction over "church-operated schools."[1] On a petition for enforcement of the Board's order in the instant case, this court remanded the matter to the Board on April 27, 1979 for reconsideration in light of the *Catholic Bishop* decision. On June 25, 1979, the Board, with Member Penello dissenting, issued a supplemental decision (243 NLRB No. 24) affirming its decision as to Ford Central. This enforcement proceeding followed.

---

1. The Seventh Circuit had squarely held that the assertion of jurisdiction by the Board over the lay faculties there involved constituted a violation of both the Free Exercise and Establishment Clauses of the First Amendment. 559 F.2d at 1123–26. The Supreme Court did not reach the constitutional issue. Chief Justice Burger writing the majority opinion preferred to avoid the constitutional issue and instead construed the Act not to cover lay teachers in church-operated schools since their inclusion would embroil the Board and the Court in difficult and sensitive questions arising out of the Religion Clauses of the First Amendment. 440 U.S. at 507, 99 S.Ct. at 1322. Justice Brennan, in a dissent joined in by Justices White, Marshall and Blackmun, construed the Act to cover the lay teachers involved. This would involve constitutional issues but the dissent did not reach them. "I do not now do so only because the Court does not." 440 U.S. at 518, 99 S.Ct. at 1328.

Since we hold that the Board lacked jurisdiction we do not consider the merits of the other issues which have been raised on this appeal.

## I

In order to determine whether Ford Central is within the holding of *Catholic Bishop* we must examine the history of the school as well as its present religious characteristics. For many years, the Roman Catholic Diocese of Brooklyn (the Diocese) owned and operated nine Catholic high schools in Brooklyn and Queens including Bishop Ford. In June 1972, a task force commissioned by the Bishop of the Diocese recommended the termination of the existing diocesan high school system. As an alternative, the Diocese in 1972 incorporated the Henry M. Hald High School Association (Hald), an educational corporation which was to operate a number of the Catholic high schools in the Diocese including Bishop Ford. By 1975 two high schools were closed and two others were transferred to religious communities or private boards. During the fall of 1975, faced with the possibility that Bishop Ford might be closed, parent groups at the school began discussions to determine the feasibility of turning the school over to a private board of trustees. In February 1976 Hald determined to close Bishop Ford and transfer it to an independent board. Brother Alphonsus Maher, who was then the principal of the school, resigned and became the first principal of the respondent Ford Central.

On September 3, 1976 the Diocese and Ford Central entered into an agreement which conveyed title to the land, buildings, improvements, fixtures and appurtenant personal property to Ford Central. The agreement recites that Ford Central is to hold title, however, only so long as it "continues the operation of a Roman Catholic high school." If it ceases to operate as a Roman Catholic high school, all rights, title and interest revert automatically to the Diocese.

Other provisions of the agreement require Ford Central to maintain the premises in good condition, and not to make major alterations or place any encumbrances or mortgages upon the premises without the approval of the Diocese. Ford Central is required to keep the buildings and contents insured in amounts and kinds of coverage satisfactory to the Diocese. Although the Diocese continues to maintain a portion of the premises for its Educational Television project, the agreement makes it clear that Ford Central is solely responsible for the "operation and maintenance of the school," and assumes responsibility for its "debts, obligations, or liabilities."

The record demonstrates and it is undisputed that Ford Central is a Roman Catholic school. Its title is "Bishop Ford Central Catholic High School." Its motto is "To Imitate Jesus." All the members of the Board of Trustees are Roman Catholics, and its two highest administrators, the principal and assistant principal, are Franciscan Brothers. The professional staff of the school is composed predominantly of teachers who are members of Roman Catholic religious orders.

The philosophy of the school is stated in its faculty manual, in these terms:

The success of this school as a Catholic school will depend on each faculty member striving as an individual and as a member of a unified faculty to form with the assistance of the Holy Spirit a *community of faith* where gospel values are the norm and Christian virtues are experienced.

This school will only be as good as the individual faculty members that make it up. The success of this academic year will depend on each faculty member contributing his/her

—religious conviction

—professional competence

—personal integrity

—belief in youth

to encourage student growth, to support fellow members of the faculty and staff and to assist administrators.

Each and every member of the faculty is to PROMOTE and UPHOLD the philosophy of this school.

*The Philosophy of Bishop Ford Central Catholic High School*

Bishop Ford Central Catholic High School is a community of persons-administrators, teachers, students and staff united by their common bond: faith in God as expressed in the Roman Catholic tradition.

The administrators and teachers recognize the mandate that "The future of humanity lies in the hands of those who are strong enough to provide coming generations with reasons for living and hoping." (*The Church Today*, 31)

In accepting this mandate, we work together to assist each student in his striving to become a mature and fulfilled Christian. Through our guidance, instruction and example, we ask that each student imitate Jesus who "advanced in wisdom and age and grace before God and men." (Luke 2:52)

We provide spiritual, educational and social opportunities which coincide with the threefold aim of Catholic education as defined in the pastoral, *"To Teach as Jesus Did."* (Emphasis in original.)

\* \* \* \* \* \*

Above all, we recognize that this philosophy must be the guiding force behind all school programs and policies.

The religious responsibilities of the faculty as set forth in the manual are quite explicit:

### RELIGIOUS RESPONSIBILITIES

Students cannot be expected to value a faith commitment or value participation in religious activities if faculty members fail to witness a vibrant interest in a Christian life style.

Each faculty member is expected:

—to witness Christ-like behavior (e.g. attitude, demeanor).

—to patiently encourage students to foster Christian attitudes.

—to participate in school liturgies and paraliturgical activities.

—to encourage, but not FORCE student participation in school liturgies and paraliturgical activities.

—to cooperate with the priest chaplain and religion department.

When a teacher applies for a position at Ford Central, the application form states specifically, "A Catholic high school has goals, spirit, opportunities, and problems often quite different from other educational institutions. Besides teaching a schedule of classes and taking a share of supervisory responsibilities, the Catholic high school teacher is expected to involve himself/herself wholeheartedly in the school's basic efforts to provide support and encouragement to a teenager's call to mature as a generous, convinced and practicing Catholic."

In addition Ford Central retains a full-time priest-chaplain who is available for counseling services and who says Mass in the school chapel once a week.

II

The Board order here was initially directed not only to Ford Central but also to the Diocese and Hald. The June 25, 1979 order dismissed the complaint as to the Diocese and its alter ego, Hald, for lack of jurisdiction under *Catholic Bishop*. This underscores the Board's position that Ford Central is within its jurisdiction only because it has severed its relationship with the Diocese. The Board did not in its opinion or on this appeal argue that Ford Central is not sufficiently Roman Catholic in its philosophy, its curriculum or in the obligation of its faculty to propagate the Roman Catholic faith and to indoctrinate the student body with the tenets of that faith. The position of the Board rather is that, having been separated from diocesan ownership and management, Ford Central is no longer "church-operated" under *Catholic Bishop*. We do not read *Catholic Bishop* so narrowly.

The minor seminaries and secondary schools whose lay faculties had been unionized in *Catholic Bishop* were owned and operated by either the Bishop of Chicago, a corporation sole, or by the Diocese of Fort Wayne-South Bend, Inc. They were therefore properly described as church-operated

schools. However, the fact that legal title to and management responsibility for the schools were vested in the church was not at all the reason for the entanglement problems created by Board asserted jurisdiction over the lay faculties of those institutions. Rather, the Court's concern was that, despite well intentioned Government involvement, the Board could not avoid "entanglement with the religious mission of the school in the setting of mandatory collective bargaining." 440 U.S. at 502, 99 S.Ct. at 1319.

In order to determine whether the issue of excessive entanglement arose in *Catholic Bishop*, the Court turned to its recent decisions involving aid to "parochial schools." Quoting *Lemon v. Kurtzman*, 403 U.S. 602, 617, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the Court in *Catholic Bishop* stated: "We cannot ignore the danger that a teacher under religious control and discipline poses to the separation of the religious from the purely secular aspects of pre-college education. The conflict of functions inheres in the situation." 440 U.S. at 501, 99 S.Ct. at 1319. Using language from *Lemon*, the Court further noted: "The substantial religious character of these church-related schools gives rise to entangling church-state relationships of the kind the Religion Clauses sought to avoid." 440 U.S. at 503, 99 S.Ct. at 1320, quoting *Lemon v. Kurtzman, supra*, 403 U.S. at 616, 91 S.Ct. at 2113.

The Court in *Catholic Bishop* also noted the "importance of the teacher's function in a church school." 440 U.S. at 501, 99 S.Ct. at 1319, quoting from *Meek v. Pittenger*, 421 U.S. 349, 370, 95 S.Ct. 1753, 1766, 44 L.Ed.2d 217 (1975):

"Whether the subject is 'remedial reading,' 'advanced reading' or simply 'reading,' a teacher remains a teacher, and the danger that religious doctrine will become intertwined with secular instruction persists."

The Court also quoted Justice Douglas' concurring opinion in *Lemon* where he noted "the admitted and obvious fact that the *raison d'etre* of parochial schools is the propagation of a religious faith." 403 U.S. at 628, 91 S.Ct. at 2118.

The entire focus of *Catholic Bishop* was upon the obligation of lay faculty to imbue and indoctrinate the student body with the tenets of a religious faith. As we have pointed out in Part I of this opinion, the obligation of the faculty both lay and religious at Ford Central is precisely that. At no place in the Court's discussion of the entanglement problem in *Catholic Bishop* is diocesan ownership and management suggested as the basis for religious entanglement. It is the commitment of the faculty to religious values no matter what subject in the curriculum is taught and the obligation to propagate those values which provides the risk of entanglement.

That the risk is real and not theoretical was pointed out by the Seventh Circuit's opinion in *Catholic Bishop*.

We are unable to see how the Board can avoid becoming entangled in doctrinal matters if, for example, an unfair labor practice charge followed the dismissal of a teacher either for teaching a doctrine that has current favor with the public at large but is totally at odds with the tenets of the Roman Catholic faith, or for adopting a lifestyle acceptable to some, but contrary to Catholic moral teachings. The Board in processing an unfair labor practice charge would necessarily have to concern itself with whether the real cause for discharge was that stated or whether this was merely a pretextual reason given to cover a discharge actually directed at union activity. The scope of this examination would necessarily include the validity as a part of church doctrine of the reason given for the discharge.

559 F.2d at 1125.

As we have pointed out in Part I, the religious mission of Ford Central was not terminated by its severance from the Diocese. Church dogma and the tenets of Roman Catholicism do not emanate from the Bishop of Brooklyn with all deference to that prelate. The analogy which the Court in *Catholic Bishop* makes to the public aid to parochial school cases is further instructive. If the Board majority is correct in

concluding that legal disaffiliation from a diocese eliminates any embroilment with First Amendment Religion Clause guarantees, then Ford Central arguably would be entitled to whatever aid a legislative body might see fit to provide. While this might be a welcome reading of *Catholic Bishop* for those who are proponents of public aid to church related schools, it would be a misinterpretation. We have searched in vain for any case involving public aid where the Court distinguished between Catholic, or other denominational, primary or secondary schools owned and operated by diocesan authority and those owned and operated by religious or lay groups. It is the suffusion of religion into the curriculum and the mandate of the faculty to infuse the students with the religious values of a religious creed which create the conflict with the Religion Clauses and not the vesting of legal title or the responsibility of operation.

That the Court in *Catholic Bishop* intended no particular limitation in using the term "church-operated" to describe religious schools is quite evident, aside from our previous discussion, in the text of the opinion itself. Thus Chief Justice Burger stated that "[t]he church-teacher relationship in a church-operated school differs from the employment relationship in a public or other nonreligious school." 440 U.S. at 504, 99 S.Ct. at 1320. Ford Central is obviously not a public or nonreligious school, and is therefore within the Court's own conception of a church-operated school. While there may be an issue in some cases as to how much religious orientation is required to characterize a school as religious, that is not the dispute here. Moreover, although "church-operated" is clearly the predominant descriptive term utilized in the opinion, the Court also speaks of "parochial schools," *id.* at 501, 99 S.Ct. at 1319, "a church school," *id.* at 501, 99 S.Ct. at 1319. It also refers to

the entanglement with church-operated schools found unacceptable "in *Lemon, Meek* and [*Wolman v. Walter,* 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977)]," *id.* at 502, 99 S.Ct. at 1319. We note in the margin the descriptions of those schools by the Supreme Court.[2]

In sum we conclude that the *Catholic Bishop* Court employed the term "church-operated" not in the restricted sense now seized upon by the Board, but rather as a convenient method of characterizing schools with a religious mission.

## III

Although we hold that enforcement of the Board's order should be denied under *Catholic Bishop* on the basis of the religious mission of Ford Central, we do not overlook the fact that the Diocese here has not completely severed its relationship with Ford Central but has retained a significant degree of control. While the ownership and operation of the school has been left in the hands of a lay board of trustees who have selected religious administrators and a professional staff predominantly affiliated with religious orders, the agreement of September 3, 1976 explicitly provides that "the 'Diocese' is desirous of making the property herein described available for the purposes of the operation of a Roman Catholic high school upon the conditions herein set forth." The first condition of the agreement is that Ford Central shall have and hold the property "so long as the grantee continues the operation of a Roman Catholic high school . . . upon the cessation of which all rights, title and interest herein conveyed shall revert to the grantor, or its successor." Paragraph 5 of the agreement further provides that if the grantee shall "cease so to operate said high school, title to the premises herein described shall automatically re-

2. In *Lemon,* the church-operated schools at issue were referred to by the Court as "church-related," 403 U.S. at 606, 91 S.Ct. at 2108, "church schools," *id.* at 615, 91 S.Ct. at 2112, and "parochial schools," *id.* at 616, 91 S.Ct. at 2113. In *Meek,* the Court used the terms "nonpublic school," 421 U.S. at 361, 95 S.Ct. at 1761, "parochial schools," *id.* at 360, 95 S.Ct. at 1760, "church-related institutions," *id.* at 363, 95 S.Ct. at 1762, and "religiously affiliated educational institutions," *id.* at 364, 95 S.Ct. at 1762. The *Wolman* Court described the schools in that case as "nonpublic," 433 U.S. at 250, 97 S.Ct. at 2606, "church-sponsored," *id.* at 251, 97 S.Ct. at 2607, and "church-related," *id.* at 251, 97 S.Ct. at 2607.

vert to the 'Diocese' without further action on its part."

It is the clear and unambiguous intent of the agreement that Ford Central continue to operate as a Roman Catholic secondary school and if the institution should deviate from its religious mission, the Diocese has the right to intervene and automatic reversion to the Diocese ensues. The position of the Board that Ford Central is a legal entity "separate and distinct from the Church" is we submit irrelevant and in any event not accurate. Ford Central is only conditionally separated from the Diocese and the condition imposed is its continuing allegiance and loyalty to the Church.

For these reasons enforcement of the Board's order is denied in its entirety.

OAKES, Circuit Judge (concurring):

I think that the question whether Ford Central is "church-operated" within *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 504, 99 S.Ct. 1313, 1320, 59 L.Ed.2d 533 (1979), is not nearly as clear as Judge Mulligan's opinion seems to suggest. Lay administrators rather than "clergy-administrators," *id.* at 502, 503, 99 S.Ct. at 1319, 1320, are here involved. Although Brother Maher was to remain as principal on the transfer from the diocesan entity, Hald, to Ford Central, the by-laws of Ford Central's predominantly lay board of trustees stated that his chief responsibility was to "implement policy decisions made by the Board." Moreover, the contract effectuating the transfer provided that "[m]anagement and control of the premises shall rest exclusively with" Ford Central.

On the other hand, that "management and control" were conditioned by the transfer contract "so long as the grantee continues the operation of a Roman Catholic high school upon the premises." And, most significantly to me, reverter takes place if such operation ceases. Thus, a real string is held by the Diocese and it is in this light, with the attendant indirect control that this condition gives the Diocese, that the entanglement considerations thought significant by the 5–4 majority in *Catholic Bishop,*

*supra*, would also be applicable here. As Judge Mulligan's opinion is careful to point out, *supra* at 822, the analogy to the public-aid-to-parochial-school cases is instructive and, like him, I have never read them to be confined to church owned and managed schools. Accordingly I concur in the judgment.