NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

ST. LOUIS CHRISTIAN HOME,
Respondent.

No. 80–2031.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 17, 1981.

Decided Nov. 11, 1981.
Rehearing and Rehearing En Banc
Denied Dec. 10, 1981.

William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Paul J. Spielberg, Deputy Asst. Gen. Counsel, Miriam Szapiro (argued), N. L. R. B., Washington, D. C., for petitioner.

McMahon, Berger, Breckenridge, Hanna, Linihan & Cody, Thomas O. McCarthy, Ralph E. Kennedy, St. Louis, Mo., for respondent.

Before BRIGHT, HENLEY, and ARNOLD, Circuit Judges.

BRIGHT, Circuit Judge.

The National Labor Relations Board (NLRB) petitions this court under section 10(e) of the National Labor Relations Act (the Act), 29 U.S.C. § 160(e) (1976), for enforcement of an order directing St. Louis Christian Home (the Home) to bargain collectively with the Nursing and Convalescent Division, Local 50, Service Employees International Union, AFL–CIO, CLC (the Union), as bargaining agent for the Home's childcare workers, a maintenance employee, and a storeroom clerk. This case presents the question of whether the Supreme Court's decision in *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979), exempting lay teachers in church-operated schools from NLRB jurisdiction, covers lay employees in church-operated institutions other than schools. We conclude that the employees of the respondent Home do not fall within the *Catholic Bishop* exemption. Accordingly, we grant enforcement of the NLRB's order.

I. *Background.*

The St. Louis Christian Home is an emergency residential treatment center for battered, abused, and neglected children between the ages of five and seventeen. It is organized as a nonprofit Missouri corporation and is an agency of the National Benevolent Association, the social service arm of the Christian Church Disciples of Christ (Christian Church). The Home was originally established in 1905 as an orphanage exclusively serving members of the Christian Church, but later changed its orientation. From the early 1960's through the early 1970's, the Home treated emotionally disturbed children from throughout Missouri, and in the early 1970's, the Home embarked on its current enterprise of treating battered, abused, and neglected children from the St. Louis area.[1]

The Home has facilities to accommodate thirty-two children and has completed construction of a cottage that will increase its capacity to forty-eight children. The Missouri Division of Family Services refers children to the Home, which accepts them as space becomes available. Children stay for an average of six weeks, during which time they remain wards of the state while a state social worker attempts to find permanent placement for them. The Home assists the state in placing the children, and provides the children with extensive therapy through social workers. Most of the children attend public school while staying at the Home, but those few (no more than six) unable to do so because of physical or mental problems attend classes in the Home.

Federal, state, and local governments provide the largest source of funds for the Home. Its funding pattern breaks down as follows:

Government: 55%
Christian Church: 19%
Investment income: 13%
Gifts: 6%
Bequests: 5%
Gifts in kind: 2%

The Missouri Division of Family Services does not license church-affiliated care institutions such as the Home, but such a care institution must fulfill the same requirements necessary for licensing of comparable nonreligious institutions in order to receive state funds for its services to abused children. For example, the Home must supply the state with copies of its constitution and bylaws, budget intake procedures, and personnel policies, as well as a list of its employees, their salaries, and records of their physical examinations. To comply with another state requirement, the Home must provide each child an opportunity for religious expression according to the religious preference of the child's family. The Home must obtain parental consent before a child attends a religious service of any church, including the Christian Church, if the practice of the church varies from the religious preference of the child or the child's family.

1. The Home also operates a limited adoption service, placing about six babies a year with Christian Church families. None of the employees in the bargaining unit engages in this activity, however.

The Union petitioned for certification as bargaining agent for the Home's childcare workers, maintenance man, and storeroom clerk on December 4, 1979. All of the employees in the bargaining unit are lay workers. State regulations prescribe minimum qualifications for childcare workers: they must be over 21 years of age, have graduated from high school, pass yearly physical examinations, and be able to prepare meals and administer prescribed medication. Religious affiliation is not a factor in selection of these employees, and the record does not show how many, if any, belong to the Christian Church.[2]

Following a representation hearing on January 7, 1980, the Regional Director of the NLRB certified the unit as appropriate for collective bargaining on January 18, 1980. The Union won the election held February 15, 1980, and on February 26, 1980, the Regional Director certified the Union as bargaining representative for the designated employees. The Home refused to bargain, contesting the NLRB's asserted jurisdiction as a violation of the first amendment and the standards set out in *NLRB v. Catholic Bishop of Chicago, supra.* The Union filed an unfair labor practices charge, and on August 27, 1980, the NLRB found the Home in violation of sections 8(a)(1) and (5) of the Act, 29 U.S.C. §§ 158(a)(1), (5) (1976), and ordered the Home to bargain with the Union. The case has come before this court on an application for enforcement and cross-petition for review of the NLRB order.

## II. *Discussion.*

### A. *Interstate Commerce.*

 The Home initially contends that it is not an employer engaged in commerce within the meaning of sections 2(6) and (7) of the Act, 29 U.S.C. §§ 152(6), (7) (1976),[3] and as a result, its activities are outside the ambit of the NLRB's jurisdiction as defined in 29 U.S.C. § 160(a).[4] Congress intended to grant the NLRB, under the commerce clause, the broadest possible jurisdiction permitted by the Constitution. See *NLRB v. Reliance Fuel Oil Corp.,* 371 U.S. 224, 226, 83 S.Ct. 312, 313, 9 L.Ed.2d 279 (1963); *NLRB v. Alexander,* 595 F.2d 454, 456 n.3 (8th Cir.), *cert. denied,* 444 U.S. 899, 100 S.Ct. 209, 62 L.Ed.2d 135 (1979); *NLRB v. Erlich's 814, Inc.,* 577 F.2d 68, 70–71 (8th Cir. 1978). The NLRB sets discretionary jurisdictional standards expressed as a minimum level of gross annual revenues, and Congress explicitly approved this policy in the Landrum-Griffin Act of 1959, 29 U.S.C. § 164(c)(1) (1976). The NLRB has set the jurisdictional standard for "day care centers, institutions involving specialized care and custody of children" at $250,000 in gross annual revenues. See *The Rhode Island Catholic Orphan Asylum, a/k/a St. Aloysius Home,* 224 NLRB 1344, 1345 n.6 (1976); *Salt and Pepper Nursery School and Kindergarten No. 2,* 222 NLRB 1295 (1976); cf. *NLRB v. Kent County Association for Retarded Citizens,* 590 F.2d 19 (1st Cir. 1978) (approving extensions of *St. Aloysius Home* standard to other nonprofit charita-

---

**2.** Eloise Moreland, the Executive Director of the Home, is the only employee shown to be a Christian Church member. Although not a member of the clergy, Moreland has some of the privileges the Christian Church accords its ministers, such as a minister's discount card.

**3.** The relevant portions of section 152 follow:

(6) The term "commerce" means trade, traffic, commerce, transportation, or communication among the several States, or between the District of Columbia or any Territory of the United States and any State or other Territory, or between any foreign country and any State, Territory, or the District of Columbia, or within the District of Columbia or any Territory, or between points in the

same State but through any other State or any Territory or the District of Columbia or any foreign country.

(7) The term "affecting commerce" means in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce. [29 U.S.C. §§ 152(6), (7) (1976).]

**4.** Subsection (a) provides in part:

(a) The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in section 158 of this title) affecting commerce. [29 U.S.C. § 160(a) (1976).]

ble institutions). Accordingly, because the Home's gross revenues in 1979 approximated $600,000, the NLRB exercised jurisdiction over the Home. Thus, the Home falls within the above jurisdictional standard.

The Home contends that because its children all come from Missouri and it purchases supplies solely from Missouri suppliers, it does not affect interstate commerce regardless of the size of its annual income. In addition to applying the $250,000 jurisdictional standard, the Board based its assertion of jurisdiction on findings that in 1979 the Home paid in excess of $16,000 for telephone and electricity to companies engaged in interstate commerce. This amount of interstate purchases supports NLRB jurisdiction over the Home. In other cases involving lesser sums, courts have approved the Board's exercise of jurisdiction, in light of the broad grant of power to the NLRB. *See, e. g., NLRB v. Maxwell,* 637 F.2d 698 (9th Cir. 1981) ($6,000 sufficient); *Von Solbrig Hospital, Inc. v. NLRB,* 465 F.2d 173 (7th Cir. 1972) ($4,925 sufficient); *NLRB v. Inglewood Park Cemetery Association,* 355 F.2d 448 (9th Cir.), *cert. denied,* 384 U.S. 951, 86 S.Ct. 1572, 16 L.Ed.2d 548 (1966) ($3,000 sufficient); *NLRB v. Aurora City Lines, Inc.,* 299 F.2d 229 (7th Cir. 1962) ($2,000 sufficient). Accordingly, we hold the Board properly exercised jurisdiction in these proceedings.

The Home also contends that the Board's jurisdiction does not extend to nonprofit institutions which do not affect commerce. The argument relies on the dissent of NLRB Member Penello in *Lighthouse for the Blind of Houston,* 248 NLRB 1366 (1980), which the Fifth Circuit adopted in denying enforcement of the NLRB bargaining order in *NLRB v. Lighthouse for the Blind of Houston,* 653 F.2d 206 (5th Cir. 1981). In that case, the court found the relationship between employer and employee to be rehabilitative rather than commercial in nature, and thus not suitable for collective bargaining. In contrast, the Home has a commercial, not rehabilitative, relationship with its employees in the bargaining unit. The record here supports the Board's determination that the operations of the Home (a nonprofit corporation) affect commerce. *See generally NLRB v. Catholic Bishop of Chicago, supra,* 440 U.S. at 511–18, 99 S.Ct. at 1324–27 (Brennan, J., dissenting) (discussing legislative history); *NLRB v. Kent County Association for Retarded Citizens, supra,* 590 F.2d at 20–23.

### B. *First Amendment.*

The Home argues that the NLRB's assertion of jurisdiction over it will lead to violation of both the establishment and free exercise clauses of the first amendment. Under the framework of analysis formulated by the Supreme Court in *NLRB v. Catholic Bishop of Chicago, supra,* this court must initially consider "whether the Board's exercise of its jurisdiction here would give rise to serious constitutional questions." 440 U.S. at 501, 99 S.Ct. at 1319. The *Catholic Bishop* Court determined that the exercise of NLRB jurisdiction over the relationship between the church and its teachers in church-operated schools raised serious first amendment questions, and refused to rule on the constitutionality of the questioned NLRB jurisdiction without a showing of the "affirmative intention of the Congress clearly expressed" to confer such jurisdiction. Because this case does not raise the serious constitutional questions discussed in *Catholic Bishop,* this court need not inquire whether Congress clearly expressed its intention to confer jurisdiction.

According to the Home, the constitutional problems arose in *Catholic Bishop* because the Catholic Church operated the schools in question. This interpretation of *Catholic Bishop* underlies the Home's contention that NLRB jurisdiction does not extend to any institution established by a church for religious reasons because a situation might arise where the NLRB would need to inquire into the legitimacy of those reasons.

Church operation, although important, constituted but one of many features which, considered together, presented potential first amendment problems in *Catholic Bishop.* Not only did the Catholic Church operate the schools, it actively propagated reli-

gious faith in the classrooms. The teachers in the bargaining unit, even though members of the laity, participated in that religious mission. The Supreme Court quoted extensively from *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), to illustrate that its concern stemmed from the religious nature of the schools' relationships with their teachers.

"Religious authority necessarily pervades the school system." * * *

We cannot ignore the danger that a teacher under religious control and discipline poses to the separation of the religious from the purely secular aspects of pre-college education.

\* \* \* \* \* \*

"[P]arochial schools involve substantial religious activity and purpose.

"The substantial religious character of these church-related schools gives rise to entangling church-state relationships of the kind the Religion Clauses sought to avoid." (Footnote omitted.)

\* \* \* \* \* \*

"[T]he *raison d'etre* of parochial schools is the propagation of religious faith." [*NLRB v. Catholic Bishop of Chicago, supra*, 440 U.S. at 501, 503, 99 S.Ct. at 1319, 1320 (quoting *Lemon v. Kurtzman, supra*, 403 U.S. at 617, 616, 628, 91 S.Ct. at 2113, 2118).]

The Court emphasized the possible religious function of a teacher employed by a school engaged in a pervasively religious enterprise.[5]

The religious character of the enterprise in *Catholic Bishop* existed at all three levels: the church, the church-operated institution, and the institution's employees. The Supreme Court concluded that the involvement of the NLRB in mediating between two of those levels would pose a significant danger of impermissible entanglement between church and state.

By contrast, the Home, though sponsored by the Christian Church, does not devote itself to the propagation of religion. The Christian Church may perceive its religious mission to include caring for unfortunate children, but the actual business of the Home and of its employees does not involve a religious enterprise comparable to a church-operated school. The Home operates in the same way as a secular childcare institution.

The evidence produced at the representation proceeding clearly demonstrates that the Home differs from a Catholic school and resembles a nonreligious institution. The Home receives funds primarily from government sources. It operates on a nonsectarian basis, hiring employees without regard to religion and taking in children solely from state agency referrals. The children remain wards of the state, and unlike the schools in *Catholic Bishop* where Catholic religious training was mandatory, the state requires the Home to obtain parental consent before resident children attend Christian Church services.

Because both the Home and its employees perform essentially secular functions, the involvement of the NLRB in mediating collective bargaining between the two does not raise the serious constitutional questions discussed in *Catholic Bishop*,[6] although some issue implicating the religion clauses

---

**5.** The Second Circuit reached the same conclusion about the *Catholic Bishop* opinion in *NLRB v. Bishop Ford Central Catholic High School*, 623 F.2d 818, 822 (2d Cir. 1980), *cert. denied*, 450 U.S. 996, 101 S.Ct. 1698, 68 L.Ed.2d 196 (1981) (holding *Catholic Bishop* applicable to Catholic school controlled by lay trustees):

The entire focus of *Catholic Bishop* was upon the obligation of lay faculty to imbue and indoctrinate the student body with the tenets of a religious faith. * * * It is the commitment of the faculty to religious values * * * and the obligation to propagate those

values which provides the risk of entanglement.

**6.** The Home works directly with the State of Missouri in accepting state referrals and in finding placements for the children, and it depends heavily on state funding. If the Home were not secular in nature, this collaboration could lead to constitutional problems under *Lemon v. Kurtzman, supra*, but because the Home is not permeated by religion, it can work closely with the state without violating the establishment clause.

could conceivably arise during collective bargaining. The Home suggests, for example, that in bargaining over wages, the Home might have to disclose the source and destination of contributions to the Christian Church, or that if the Christian Church decides to relocate or close the Home, the NLRB could question its decision. However, "[t]he possibility of impairment [of sectarian objectives] must be more substantial than one based on dark speculation and forboding fancy." *St. Elizabeth Community Hospital v. NLRB*, 626 F.2d 123, 129 (9th Cir. 1980) (Sneed, J., dissenting) (remand for further factfinding in light of *Catholic Bishop*). The Home has not demonstrated that such impairment will likely occur. The Home's activities relate only tangentially to the religious mission of the Christian Church, and inquiry into the operation of the Home should not intrude on any activity substantially religious in character. The Home operates in the same way as a secular childcare institution and voluntarily accepts state regulation which treats it in the same way. Thus, under the circumstances of this case, the NLRB properly treated the Home in the same manner as a secular institution.

III. *Conclusion.*

The NLRB's assertion of jurisdiction over the Home does not raise the serious constitutional questions contemplated in *Catholic Bishop.* We affirm the NLRB's finding that the Home is subject to the Act because its operations affect interstate commerce. Accordingly, we enforce in full the NLRB's order requiring the Home to bargain collectively with the Union.