NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

The SALVATION ARMY OF MASSA-
CHUSETTS DORCHESTER DAY
CARE CENTER, Respondent.

No. 84-1778.

United States Court of Appeals,
First Circuit.

Argued March 4, 1985.
Decided May 23, 1985.

Paul J. Spielberg, Deputy Asst. General
Counsel, Washington, D.C., with whom
Marjorie S. Gofreed, Rosemary M. Collyer,
General Counsel, John E. Higgins, Jr., Dep-
uty General Counsel, Robert E. Allen, As-
sociate General Counsel, and Elliott Moore,
Deputy Associate General Counsel, Wash-
ington, D.C., were on brief for petitioner.

Carl A. Schwarz, Jr., New York City,
with whom Raymond L. Vandenberg, Brian
D. Sullivan, Kenneth A. Margolis, and Fin-
ley, Kumble, Wagner, Heine, Underberg,
Manley & Casey, New York City, were on
brief for respondent.

Before CAMPBELL, Chief Judge, COF-
FIN, Circuit Judge, and RE,* Judge.

* Chief Judge of the United States Court of Inter- national Trade, sitting by designation.

**2**

COFFIN, Circuit Judge.

Petitioner, the National Labor Relations Board ("the Board"), seeks enforcement of an order it issued against respondent, The Salvation Army of Massachusetts Day Care Center ("the Center"), requiring the latter to resume collective bargaining with its employees' union representative. The Board claims that it has jurisdiction over the religiously affiliated Center and that the Center's "religious purpose" is not a mandatory collective bargaining subject. The Center disputes both of these claims, alleging that there is a significant risk that the Board will infringe upon its First Amendment rights. For reasons discussed below, we find ourselves in disagreement with the Center and require it to comply with the Board's order to return to the bargaining table.

FACTS

The critical facts presented in the record are as follows. The Salvation Army is a nonprofit, religious organization, a branch of the Christian Church, which provides a wide variety of social service programs. The Center is one of those programs and is operated by The Salvation Army's Massachusetts Division. Located in Boston, the Center provides day care services to approximately sixty children between the ages of three and five. The children are selected solely on the basis of their need for day care and without regard to creed. The Center provides no religious instruction or activities for the children. Indeed, the program has only an insignificant formal educational component, a half-hour period set aside daily for such guided activities as art, music, literature, drama, and science. The real focus is upon the development of self-help and social skills.

The staff consists of nine teachers, a social worker, a janitor, and a cook. They too are selected without regard to creed. No significant condition of their employment is of a religious nature,[1] and they are given no religious training. Of these staff members, only the cook was identified as possibly being a member of The Salvation Army.

Charged with the responsibility of overseeing the work of the staff is the Center's director. There is no requirement that the director be a member of The Salvation Army.[2] Although the record contains a passing reference to the fact that one of the employees, the social worker, may have been interviewed by someone from the office of The Salvation Army's Massachusetts Division, as well as by the Center's director, the evidence clearly indicates that the director, not the central office, has primary, if not sole, responsibility for the employment, management, and discipline of the staff and for the operation of the Center.

While the Center's building is used at times for other social service programs, some of which have a religious or spiritual component, there is no evidence that these programs are related to the day care program. Also, although the former director of the Center would meet with other officers of The Salvation Army each month for prayer and discussion of the Center's purpose, there is no evidence that the present director attends such meetings or that their religious aspects have ever been conveyed to the Center's staff or infused into its programs. Similarly, while the monthly parents' council meetings are attended by a Salvation Army representative who says a prayer to remind the parents of The Salvation's Army's "link" with the Center, there is no requirement that the parents be

1. The employee handbook issued to staff members does require employees to smoke outside of the building, since smoking is not "in keeping with the organization", and asks the employees "to perpetuate [The Salvation Army's] reputation for patient, kind helpfulness", but nothing in the handbook suggests that the staff is to adopt or propagate The Salvation Army's doctrines.

2. During the initial stages of this dispute, including the relevant collective bargaining sessions in late 1980 and early 1981, the director was an officer of The Salvation Army. However, by the time the subsequent administrative hearing was held in December of 1981, he had been succeeded by a lay person.

Christians, let alone members of The Salvation Army. The critical message to the parents is that the function of the Center is to develop the whole child, not to teach religious doctrine or convert the child or parent to Christianity.

PROCEDURAL HISTORY

In February of 1979, the Center and District 65, International Union, United Automobile, Aerospace & Agricultural Implement Workers of America ("the Union"), agreed to hold a certification election. The Stipulation for Certification upon Consent Election signed by both parties stated, among other things, that the Center's teachers, janitor, cook and social worker comprised the appropriate bargaining unit. On April 20, 1979, the Union won the election by a vote of nine to three.

Between the time the stipulation was signed and the election was held, the Supreme Court ruled in *National Labor Relations Board v. Catholic Bishop of Chicago*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979) (hereinafter *Catholic Bishop* ), that the National Labor Relations Act (the Act) was not intended by Congress to give the Board jurisdiction over the lay teachers of parochial high schools whose programs included religious instruction and extracurricular activities. Arguing that *Catholic Bishop* provided a new ground for challenging the Board's jurisdiction, the Center filed a timely objection to the certification election. The Acting Regional Director recommended that the objection be overruled and on January 18, 1980, the Board adopted that recommendation. *The Salvation Army of Massachusetts Dorchester Day Care Center*, 247 N.L.R.B. 413 (1980). The Board took a narrow view of *Catholic Bishop* finding that it applied only to cases involving "teachers in church-operated schools". *Id.* The Board stated in broad terms that *Catholic Bishop* did not apply to day care centers because they "are primarily concerned with custodial care of young children, and only secondari-

ly concerned with education." *Id.* In accordance with this view, the Board concluded that it had jurisdiction and certified the Union as the exclusive representative of the Center's employees.

Negotiations, which began in September of 1980,[3] reached an impasse in January of 1981. At first, the Center stated that there was no need to discuss any non-economic terms other than those embodied in the Union's contract with another, unrelated employer. Eventually relinquishing this stand, the Center proposed non-economic terms of its own making. Most importantly, it proposed an "Agency Functions and Management Rights" clause that tied together what has since been called a "religious mission" or "ecclesiastical" clause with a demanding but fairly ordinary management rights clause. The ecclesiastical clause read in its entirety:

"The parties recognize that The [Salvation] Army is an international, religious, and charitable movement, organized and operated as a branch of the Christian Church, based upon a motivation of a love of God and a concern for the needs of humanity [as] expressed by a wide variety of social services, including the functions of the Center, which are extended to all persons without discrimination as to race, color, creed, or national origin.

"The parties further recognize that the operation of the Center is an integral part of the mission of the Army, and that neither the Union nor any employee shall engage in any activity which interferes with, or contests the mission of the Army."

The Center believed that this clause was a mandatory bargaining subject and that the Center therefore could demand in good faith that it be included in the final agreement. Ultimately, the Center went even further than this, however, by refusing to discuss any other terms until the Union agreed to include the clause. The Union,

---

**3.** The Center actually refused to bargain at first, which prompted the Union to file an unfair labor practice charge. This was withdrawn when the Center changed its mind and agreed to negotiate.

on the other hand, believed that the clause was not a mandatory bargaining subject and that any actual terms or conditions of employment that it was intended to address could and should be addressed in several particular clauses rather than in one catch-all provision. Although the Union refused to include the clause, it sought to continue the negotiations by going on to other topics and seeing if agreement could be reached on them.

After the Center took its all-or-nothing stance, the Union filed an unfair labor practice charge. This resulted in a two-day hearing before an administrative law judge (ALJ) early in December of 1981. During the second day of the hearing, over the objection of general counsel for the Board, the ALJ heard testimony and received documentary evidence concerning the religious mission of The Salvation Army's social service programs, in general, and the Center, in particular. A subsequent special appeal by the Board's general counsel concerning the admission of this evidence was ultimately withdrawn, and the ALJ closed the hearing upon the general counsel's unopposed application.[4]

On June 29, 1982, the ALJ issued his decision. He concluded that no newly discovered or previously unavailable evidence had been proffered, and no special circumstances shown, which might require a reversal of the Board's 1980 finding of juris-

diction. He also ruled that because the ecclesiastical clause did "not bear a direct relationship to wages, hours or working conditions", it was not a mandatory subject of bargaining and the Center had violated section 8(a)(5) of the Act by insisting on its inclusion in the agreement. Finally, he found that the Center's refusal to discuss terms other than the ecclesiastical clause also was a violation of section 8(a)(5). He recommended that the Center be ordered to continue bargaining and to stop demanding the inclusion of the ecclesiastical clause.[5] Two years later, in a brief opinion the Board affirmed the ALJ's findings and conclusions and adopted his recommended order. *The Salvation Army of Massachusetts Dorchester Day Care Center*, 271 N.L.R.B. No. 37 (1984).[6]

The Board now petitions us for enforcement of that order, and the Center opposes the petition. We are asked to review the rulings on jurisdiction and the ecclesiastical clause.

## BOARD'S JURISDICTION OVER THE CENTER

Under the analysis employed in *Catholic Bishop*, 440 U.S. at 502, 99 S.Ct. at 1319, the critical question is whether "the exercise of the Board's jurisdiction presents a significant risk that the First Amendment will be infringed." Having carefully examined the record, we conclude that this case

---

**4.** Because both sides were given, and took advantage of, the opportunity to present all the evidence they wanted, remanding the case for further administrative hearings, as has been suggested by the Center, would not be appropriate.

**5.** The ALJ also found that the Center had committed a number of other unfair labor practices subsequent to the breakdown in the negotiations. These included such acts as discouraging employees from engaging in union activities and making unilateral changes in various conditions of employment. The ALJ's findings as to these matters have not been raised on appeal and we do not address them.

**6.** The three-member panel affirmed the ALJ's decision by a two-to-one vote. The dissenting member did not address *Catholic Bishop*. Rather, he turned to the question of the Board's discretionary jurisdiction and stated that he would follow the policy that the Board "set in

*Ming Quong Children's Center*, 210 N.L.R.B. 899 (1974), and decline jurisdiction over nonprofit, charitable institutions except where a particular class of these institutions has a massive impact on interstate commerce." Although the Center would have us review the Board's discretionary jurisdiction, we decline to do so. Since the Board overruled *Ming Quong Children's Center* in 1976 in *The Rhode Island Catholic Orphan Asylum, a/k/a St. Aloysius Home*, 224 N.L.R.B. 1344, 1344–45 (1976), its general policy has been to exercise its statutory jurisdiction over non-profit, charitable institutions. We see no point in reconsidering a policy that has already been approved by this circuit and at least one other. *See National Labor Relations Board v. Kent County Association on Retarded Citizens*, 590 F.2d 19, 23 (1st Cir.1978); *National Labor Relations Board v. St. Louis Christian Home*, 663 F.2d 60, 63 (8th Cir.1981).

does not present such a risk and that the Board's determination that it has jurisdiction over the Center is correct.

We start by looking at the facts of *Catholic Bishop* and two other cases to put this case into perspective. In *Catholic Bishop*, the institutions involved were parochial high schools. Some were "minor seminaries" designed to train a significant number of students for the priesthood. All provided a secular education that was "oriented to the tenets of the Roman Catholic faith" and all made religious training mandatory. *Id.* at 493, 99 S.Ct. at 1315. In this context the Court found that the lay teachers played "a critical and unique role ... in fulfilling the mission" of the schools. *Id.* at 501, 99 S.Ct. at 1319. That mission, " 'the *raison d'etre* ' " of such schools, was described as " 'the propagation of a religious faith'." *Id.* at 503, 99 S.Ct. at 1320 (quoting *Lemon v. Kurtzman*, 403 U.S. 602, 628, 91 S.Ct. 2105, 2118, 29 L.Ed.2d 745 (1971) (Douglas, J., concurring)). Given that mission and the fact that the schools involved " 'substantial religious activity and purpose' ", *id.*, the Court concluded that there was a significant risk that labor disputes would arise which would raise "serious First Amendment questions", *id.* 440 U.S. at 504, 99 S.Ct. at 1320.

In a similar case, *National Labor Relations Board v. Bishop Ford Central Catholic High School*, 623 F.2d 818, 822–23 (2d Cir.1980) (hereinafter *Bishop Ford* ), the court determined that the transfer of control of a Roman Catholic high school from a Roman Catholic diocese to an independent board of lay trustees did not really change the fundamentally religious orientation of the school. That orientation was demonstrated by, among other things, the fact that most of the school's teachers were "members of Roman Catholic religious orders", *id.* at 820, and the fact that the faculty manual emphasized the need for each faculty member to have religious conviction, to keep in mind that the school was a community united by each individual's "faith in God as expressed in the Roman Catholic tradition", "to witness Christ-like behavior", and "to participate in school liturgies and paraliturgical activities", *id.* at 820–21. As the school's application form for teachers summarized the matter, "the Catholic high school teacher is expected to involve himself/herself wholeheartedly in the school's basic efforts to provide support and encouragement to a teenager's call to mature as a generous, convinced and practicing Catholic." *Id.* at 821. Recalling that "[t]he entire focus of *Catholic Bishop* was upon the obligation of lay faculty to imbue and indoctrinate the student body with the tenets of a religious faith", the court found that the lay teachers at Bishop Ford had the same obligation and that the school therefore did not fall within the Board's jurisdiction. *Id.* at 822–23.

In the third case, *Denver Post of the National Society of the Volunteers of America v. National Labor Relations Board*, 732 F.2d 769 (10th Cir.1984) (hereinafter *Denver Post* ), however, the situation was very different and the court concluded that the Board did have jurisdiction. The case involved six social services programs, three of which provided temporary shelter for children and teenagers. *Id.* at 771 n. 1. All six programs were run by the Volunteers of America (the VOA), a religious organization whose primary purpose was described as follows:

> "[Its] primary purpose ... is to perform religious missionary activities; all other activities are secondary to that prime goal. It conducts its programs pursuant to the tenet that through the good work and counsel it provides, those who are helped will come to find God. The VOA claims that its programs are an expression of its underlying religious philosophy and are central to its religious mission." *Id.* at 772.

The court added, however, that it was "by no means clear" that religion played a central role in the VOA's social services programs. *Id.* The clients were given temporary care; staff members were not required to be of any particular religious persuasion or have any special religious training; the programs themselves did not

include any religious instruction, activities, or proselytizing; and the employees "stated that religion played no part in their work". *Id.* Given these factors and others, the court concluded that the Board's exercise of jurisdiction posed no significant risk of First Amendment infringement. *Id.* at 773. Explaining its conclusion, the court reasoned that "[u]nlike the schools in *Catholic Bishop*, the VOA programs are not pervasively religious in character, despite their religious objectives. On the contrary, the programs function in essentially secular fashion." *Id.* A little earlier in its opinion the court noted that

> "the First Amendment problems identified by the Court in *Catholic Bishop* stemmed not from the church's philosophy itself, but from the infusion of that philosophy into the school's functions and the critical role it performed. In contrast, although the VOA's social programs are expressive of its religious philosophy, the two are not overtly intertwined." *Id.* at 772.

■ Turning to the instant case, we find a situation significantly different from those in *Catholic Bishop* and *Bishop Ford* and almost identical to that in *Denver Post.* The program's function is primarily to provide care for the children, not education. It involves no religious instruction, indoctrination, or extracurricular activities. Neither the teachers, children, nor parents are chosen for their religious affiliation. Nor do they receive any religious training. The director, who oversees the workplace, need not be, and is not presently, a clergyman. No significant condition of employment is imposed with an overt religious purpose in mind. Also, just as in *Denver Post*, although there is evidence that the Center fulfills the religious mission of The Salvation Army, there is no evidence that the Center serves anything other than a secular function with respect to the children, parents, and teachers. Although the teachers are aware of the religious purpose of The Salvation Army, there is not that intertwining of religious doctrine and secular teaching which created the risks present in *Catholic Bishop* and *Bishop Ford.*[7] Finally, the Center, being a day care facility and taking only children with identified parents, appears to have less opportunity to influence the religious beliefs of its clients than did the temporary shelters in *Denver Post* which served children who had run away from their homes.

We therefore read *Catholic Bishop* and its progeny as requiring a finding of jurisdiction in this case. We are not faced with that "infusion of religion" into programming which sets institutions such as parochial high schools apart from secular high schools. *Denver Post*, 732 F.2d at 772. If the Center provided not just day care for children but also religious instruction and religiously oriented extracurricular activities, a different result might be required. Instead, we have an institution whose primary business is the provision of care and whose operation is indistinguishable from that of secular day care centers. The risk of serious constitutional questions being raised in these circumstances is simply too insignificant and speculative to be comparable to the risks present in *Catholic Bishop* and *Bishop Ford.* *See National Labor Relations Board v. St. Louis Christian Home*, 663 F.2d 60, 64 (8th Cir.1981). Precedent thus calls for a finding of jurisdiction. *See, e.g., Denver Post*, 732 F.2d at 773; *Tressler Lutheran Home for Children v. National Labor Relations Board*, 677 F.2d 302, 305 (3d Cir.1982) (*Catholic Bishop* distinguished on the ground that the main function of a nursing home is to "give personal attention to the elderly and infirm"); *St. Louis Christian Home*, 663 F.2d at 65 (jurisdiction found over lay workers at home for battered and abused

---

**7.** In *Denver Post*, 732 F.2d at 772, the employees were not even aware of the religious mission of the VOA. While we acknowledge that their ignorance, as well as the VOA programs' receipt of federal funds, were factors considered by the *Denver Post* court, we do not think they determined the outcome there. Indeed, their absence here in no way alters the ultimate fact that the Center operates just as do its secular counterparts, fulfilling solely secular functions in the eyes of the children, parents, and teachers.

children because the function and operation of the home were no different from those of secular childcare institutions).

Finally, were we not to find jurisdiction, we might inadvertently be offering all private day care centers and other private providers of care a formalistic means of circumventing federal labor laws. By articulating some religious affiliation and mission,[8] no matter how little effect it might have on the social programs' functions or operations, providers of care could easily avoid the Board's jurisdiction even though the work settings involved would be suitable for collective bargaining. Nothing in *Catholic Bishop* suggests that such a result is desirable or was sought by Congress in enacting the National Labor Relations Act.

## VIOLATION OF SECTION 8(a)(5)

Section 8(a)(5) of the Act, 29 U.S.C. § 158(a)(5), "makes it an unfair labor practice for an employer 'to refuse to bargain collectively with the representatives of the employees.'" *National Labor Relations Board v. Borg-Warner Corp.*, 356 U.S. 342, 348, 78 S.Ct. 718, 722, 2 L.Ed.2d 823 (1958) (hereinafter *Borg-Warner*). Collective bargaining is defined as "the performance of the mutual obligation of the employer and the representative of the employees ... to confer in good faith with respect to wages, hours, and other terms and conditions of employment...." 29 U.S.C. § 158(d). While each party has a duty to bargain about genuine terms and conditions of employment, "[a]s to other matters, ... each party is free to bargain or not to bargain, and to agree or not to agree." *Borg-Warner*, 356 U.S. at 349, 78 S.Ct. at 722.

■ Thus, a subject of collective bargaining is considered to be either a mandatory subject, one about which the parties must bargain, or a non-mandatory subject, one which either party may refuse to discuss. With respect to a mandatory subject, a party is not required to concede its position if it is maintained in good faith. 29

U.S.C. § 158(d); *H.K. Porter Co. v. National Labor Relations Board*, 397 U.S. 99, 106, 90 S.Ct. 821, 825, 25 L.Ed.2d 146 (1970). With respect to a non-mandatory subject, though, the party may propose a clause but may not in good faith insist upon its inclusion because to do so would be to "refus[e] to bargain about the subjects that are within the scope of mandatory bargaining." *Borg-Warner*, 356 U.S. at 349, 78 S.Ct. at 723.

Mandatory subjects encompass those "issues that settle an aspect of the relationship between the employer and employees." *Allied Chemical & Alkali Workers of America v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 178, 92 S.Ct. 383, 397, 30 L.Ed.2d 341 (1971). As we have suggested before, this means that the subject must bear a "direct, significant relationship to ... terms or conditions of employment", rather than a "remote or incidental relationship". *National Labor Relations Board v. Massachusetts Nurses Association*, 557 F.2d 894, 898 (1st Cir.1977). The Board having concluded that such a direct relationship did not exist here, we must accept that conclusion unless we find it unreasonable or unprincipled, for as the Supreme Court has suggested, determining what is or is not a mandatory subject lies "at the heart of the Board's function." *Ford Motor Co. v. National Labor Relations Board*, 441 U.S. 488, 494–97, 99 S.Ct. 1842, 1847–49, 60 L.Ed.2d 420 (1979).

Reduced to its essentials, the Center's argument is that the ecclesiastical clause is a mandatory subject because it is part of a traditional management rights clause and because without it The Salvation Army will be deprived of its right to insure that the Center fulfills its spiritual mission. Neither of these arguments is persuasive. As to the first, while it is true that a management rights clause covering terms or conditions of employment is a mandatory subject, *National Labor Relations Board v. American National Insurance Co.*, 343

---

8. In making this point, we do not mean to suggest that The Salvation Army is not a well respected religious organization or that it lacks a genuine religious purpose.

U.S. 395, 409, 72 S.Ct. 824, 832, 96 L.Ed. 1027 (1952), the objection in this case is not to the fairly standard management rights provisions but to the ecclesiastical clause that precedes them and which can easily be severed from them.

As for the second argument, that without the ecclesiastical clause The Salvation Army will not be able to insure that the Center fulfills its spiritual mission, we return to the considerations underlying our analysis of the jurisdictional issue. Put simply, the facts show that the mission of the Center has been quite adequately fulfilled for years by its provision of what is in all significant aspects a secular day care program. While the employee handbook contains a brief description of the spiritual mission of The Salvation Army, there is no suggestion in the handbook that the terms or conditions of employment at the Center were directly affected or determined by this mission. Thus, we can find no justification in the record for the Center's sudden insistence upon this particular clause.

This is not to say, of course, that it was impermissible for the Center to propose the clause. *Borg-Warner*, 356 U.S. at 349, 78 S.Ct. at 722, affirms the employer's right to propose a clause concerning a non-mandatory subject. It is the insistence upon the inclusion of the clause that violates the Act. *Id.* Moreover, such an all-or-nothing stand in this case made little sense because

the Union was willing to discuss the religious aspect of any specific clause that the Board wanted to incorporate and that did in fact involve a mandatory subject of collective bargaining. And, of course, there is no question that the Center, in maintaining its positions with respect to mandatory subjects, was free to take into account any religious concerns it had.[9]

For these reasons we conclude that the Board reached a reasonable and principled result in holding that the ecclesiastical clause was not a mandatory subject because it did not bear a direct relationship to the terms or conditions of employment at the Center. It follows from this conclusion that the Board was correct in finding that the Center violated section 8(a)(5) by insisting on the inclusion of the clause in the collective bargaining agreement.[10]

*Having found that petitioner has jurisdiction over respondent and that petitioner's decision of July 13, 1984, should be upheld, we order respondent to comply with petitioner's order of the same date.*

---

9. The negotiations that took place with respect to one mandatory subject, the employee's right to a Union bulletin board, illustrate the problems with the Center's absolute stand on the ecclesiastical clause, as well as the weakness of its claim that there remains a serious risk of its First Amendment rights being infringed. The Center proposed that The Salvation Army have the power to remove from the bulletin board any material which it deemed "inflammatory". Explaining why such power of censure was necessary, the Center came up with what it admitted was the hypothetical possibility that the Union might use the bulletin board to advertise the availability of abortion services for the Center's employees and that such an announcement would be offensive to the officers and members of The Salvation Army who might see it. The first point to be made about this proposal is simply that it related directly to a condition of employment at the Center, the right to a Union bulletin board, and thus involved a mandatory bargaining subject. The second point is that through specific clauses such as this, the Center was able to take into account religious concerns that it had. Finally, the fact that the Center admitted its example was merely hypothetical and had no basis in the prior activities or statements of its employees shows that the chances that a serious and genuine First Amendment question will be raised when the parties return to the bargaining table are speculative at best.

10. Although by reaching this result we obviate the need to review the Board's further finding that the Center also violated section 8(a)(5) by refusing to consider proposed terms other than the ecclesiastical clause, we note in passing that this secondary finding is fully supported by the record and by case law. *See, e.g., Eastern Maine Medical Center v. National Labor Relations Board,* 658 F.2d 1, 11 (1st Cir.1981).