**DENVER POST OF THE NATIONAL SOCIETY OF THE VOLUNTEERS OF AMERICA, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 82–1157.**

United States Court of Appeals, Tenth Circuit.

April 16, 1984.

---

William J. Carroll and John M. Husband, Denver, Colo. (John D. Coombe with John M. Husband, Denver, Colo., on the brief), of Holland & Hart, Denver, Colo., for petitioner.

Edward Dorsey, N.L.R.B., Washington, D.C. (William Wachter, Atty., William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, Washington, D.C., on brief), for respondent.

Before McWILLIAMS, LOGAN and SEYMOUR, Circuit Judges.

SEYMOUR, Circuit Judge.

This case is before us on the petition of the Denver Post of the National Society of the Volunteers of America (VOA) to review an order of the National Labor Relations Board requiring the VOA to bargain with the United Nurses, Professionals and Health Care Employees (the Union). The VOA contends that (1) because it is a religious organization, the Board's assertion of jurisdiction violates the First Amendment to the United States Constitution; and (2) the VOA's pervasive connections with local and federal governmental agencies deprive it of sufficient control over its labor relations to engage in meaningful collective bargaining. For the reasons set forth below, we hold that the Board properly exercised jurisdiction over the VOA. Accordingly, we grant enforcement of its order.

## I.

The VOA is a religious movement founded in New York City in 1896. Its purpose is to reach and uplift all segments of the population and to bring them to a knowledge of God. The Denver Post of the VOA, founded in 1898, is an unincorporated association operated under the direction of the National Society. It maintains three chapels in the Denver area at which it conducts regular religious services and Bible study groups. The VOA also operates a number of social programs in Denver. Among these are several facilities that provide temporary shelter, care, and counseling for women and children.

In January 1981, the Union filed a petition with the NLRB seeking certification as the bargaining representative of a unit of counselors employed by the VOA in six of

these programs.[1] After a two-day representation hearing, the NLRB Regional Director issued a decision directing an election. The Regional Director found that although the VOA is a religious organization, the services provided in its programs are of a secular nature and are not a dissemination of the VOA's religious doctrine. He also found that despite its contractual relationships with governmental agencies in the funding and administration of these programs, the VOA maintains sufficient control over its labor relations to enable it to bargain effectively with the Union.

An election was held in April, which the Union won by a large majority. Subsequently, through an exchange of letters, the Union requested that the VOA bargain with it concerning wages, hours, and conditions of employment. The VOA refused on the ground that the Regional Director's finding of jurisdiction was erroneous and contrary to established law. Acting upon a charge filed by the Union, the Regional Director subsequently issued a complaint alleging that the VOA had violated sections 8(a)(5) and 8(a)(1) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(5) and (1) (1982) (the Act), by refusing to bargain with the Union. Shortly thereafter, the VOA and the Union jointly filed a stipulation for the entry of an NLRB order finding a technical refusal to bargain by the VOA and directing it to bargain with the Union. The stipulation acknowledged the Union's certification and the VOA's refusal to bargain, and stated that the sole purpose of the VOA's action was to have this court determine whether the Board's exercise of jurisdiction was in error. In January 1982, the Board entered the requested order. This appeal followed.

## II.

The VOA contends it is a religious organization and the First Amendment therefore protects its affairs from governmental interference. Relying on *NLRB v. Catholic Bishop,* 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979), the VOA argues that given the central role of its social programs in its religious mission, the Board cannot assert authority over the labor relations in those programs without becoming impermissibly entangled in religious matters. The NLRB Regional Director agreed that the VOA is a religious organization, but concluded that the services provided by its programs "are social services of a secular nature and are not a promulgation of the [VOA's] religious doctrine." Rec., vol. III, at 671.

In *Catholic Bishop,* the Supreme Court examined the propriety of NLRB jurisdiction over lay faculty members at several church-operated high schools. Recognizing an impermissible risk of excessive governmental entanglement in the church's affairs, and finding no clear Congressional intent that teachers in church-operated schools should be covered by the Act, the Court concluded that the schools were not within the Board's jurisdiction. Under the Court's analysis in *Catholic Bishop,* we must determine "whether the Board's exercise of its jurisdiction here would give rise to serious constitutional questions." 440 U.S. at 501, 99 S.Ct. at 1319. Should such questions exist, we need address them only if we first identify " 'the affirmative intention of the Congress clearly expressed' " to confer NLRB jurisdiction over the programs here at issue. *Id.* (quoting *McCulloch v. Sociedad Nacional de Marineros de Honduras,* 372 U.S. 10, 21–22, 83 S.Ct. 671, 677–678, 9 L.Ed.2d 547 (1963)). Because we hold that this case raises no serious constitutional question, we need go no further.

In finding a substantial risk of religious entanglement in *Catholic Bishop,* the

---

1. The six programs at issue in this case are: Bannock, a temporary care shelter for up to ten adolescent boys; Fillmore, a comparable facility for up to ten girls; Triad, a coed temporary care shelter for up to twelve children, with a component for runaway youths; Brandon, a short term emergency shelter for up to forty-three women and children, with a component for battered women; Columbine, a thirty day facility for up to twenty-five battered women; and Victim Assistance, a program for victims of crime offering a twenty-four hour crisis phone line, counseling, and legal assistance.

Court placed great significance on the "'obvious fact that the raison d'etre of parochial schools is the propagation of a religious faith,'" *id.* 440 U.S. at 503, 99 S.Ct. at 1320 (quoting *Lemon v. Kurtzman,* 403 U.S. 602, 628, 91 S.Ct. 2105, 2118, 29 L.Ed.2d 745 (1971) (Douglas, J., concurring)), and emphasized "the critical and unique role of the teacher" in fulfilling the schools' religious mission. *Id.* 440 U.S. at 501, 99 S.Ct. at 1319. As the Second Circuit has observed, the First Amendment conflict in *Catholic Bishop* arose from "the suffusion of religion into the curriculum and the mandate of the faculty to infuse the students with the religious values of a religious creed." *NLRB v. Bishop Ford Central Catholic High School,* 623 F.2d 818, 823 (2d Cir.1980), *cert. denied,* 450 U.S. 996, 101 S.Ct. 1698, 68 L.Ed.2d 196 (1981).

◼ In the instant case, we find no comparable infusion of religion into the VOA social programs. It is true that the stated primary purpose of the VOA is to perform religious missionary activities; all other activities are secondary to that prime goal. It conducts its programs pursuant to the tenet that through the good work and counsel it provides, those who are helped will come to find God. The VOA claims that its programs are an expression of its underlying religious philosophy and are central to its religious mission. Nevertheless, that religion plays a central role in the programs themselves is by no means clear.

The VOA programs provide temporary care and counseling to those in need of such services, including male and female adolescents, runaway youths, battered women, and victims of crime. Although its officers are all either licensed or ordained ministers, the VOA does not require the counselors who staff and supervise its social programs to have any particular religious background or training. No reli-

gious activities are conducted at the programs' facilities, nor is religious counseling provided. Those who request or require spiritual guidance are referred to an appropriate church or to the VOA's religious services. The VOA does not proselytize either its clients or its employees. Rather, it seeks to return people to the church of their choice, or to direct them to the VOA if they do not belong to any other church.

Regardless of how the VOA views the relationship between its religious mission and social programs, that view clearly is neither imposed upon nor shared by its employees. All of the program employees who testified at the representation hearing stated that religion played no part in their work at the VOA. They further testified that they were not told of the VOA's religious mission when they were hired, and several stated that they remained unaware of that mission until the onset of this labor dispute. Even if through their humanitarian work VOA employees unknowingly propagate their employer's religious doctrine, this role is a far cry from that of the parochial schoolteachers in *Catholic Bishop,* and thus poses significantly less potential for entangling the NLRB in religious matters.

As noted above, the First Amendment problems identified by the Court in *Catholic Bishop* stemmed not from the church's religious philosophy itself, but from the infusion of that philosophy into the school's functions and the critical role it performed. In contrast, although the VOA's social programs are expressive of its religious philosophy, the two are not overtly intertwined. It is clear from the record that despite the religious purposes underlying these programs, they function in essentially a secular fashion.[2]

Faced with similar challenges to NLRB jurisdiction, other courts have looked to the

---

**2.** The secular appearance of these programs is readily understandable in view of the substantial funding they receive from federal and local government agencies. *See infra* section III. As the Board correctly points out in its brief, the direct use of government funds to further sec-

tarian purposes would raise serious establishment questions under the First Amendment, as well as the Colorado Constitution. Brief for the NLRB at 31; *see NLRB v. St. Louis Christian Home,* 663 F.2d 60, 64 n. 6 (8th Cir.1981).

function rather than the purpose of the activity in question and have found no serious risk of First Amendment conflict. In *NLRB v. St. Louis Christian Home*, 663 F.2d 60 (8th Cir.1981), for example, the Eighth Circuit upheld the Board's jurisdiction over a church-operated home for battered, abused, and neglected children. The court distinguished the Home from the parochial schools in *Catholic Bishop*, observing that the Home did not actively propagate religion, received funds primarily from government sources, operated on a non-sectarian basis, and hired employees without regard to religion.

In assessing the potential effects of NLRB mediation, the court focused on the nature of the Home's activities. It found that while the Church "may perceive its religious mission to include caring for unfortunate children ... the actual business of the Home and of its employees does not involve a religious enterprise comparable to a church-operated school. The Home operates in the same way as a secular childcare institution." *Id.* at 64. The court concluded that "[b]ecause both the Home and its employees perform essentially secular functions, the involvement of the NLRB in mediating collective bargaining between the two does not raise the serious constitutional questions discussed in *Catholic Bishop*." *Id.*

Examining a nursing home affiliated with the Lutheran Church, the Third Circuit employed a similar function analysis in *Tressler Lutheran Home for Children v. NLRB*, 677 F.2d 302 (3d Cir.1982). Despite the Church's contention that it operated the Home in furtherance of Lutheran practice in implementing the biblical corporate works of mercy, the court concluded that:

> "The primary function of a nursing home is care of the elderly and infirm. We recognize that the religious atmosphere and motivation at the Tressler Home are beneficial to the well-being of the patients, but the actual physical care

given is comparable to that furnished by secular facilities. In that sense the religious atmosphere is secondary to that of direct patient care. The raison d'etre of parochial schools, however, is the teaching of religious doctrine. Thus, the 'critical and unique role of the teacher in fulfilling the mission of a church-operated school,' as found in *Catholic Bishop* ... differs from the main function of those who give personal attention to the elderly and infirm."

*Id.* at 305. The court found that although collective bargaining would impose "some constraints" upon the Church's operation of the nursing home, "direct religious conflict" was "neither inevitable nor probable." *Id.* at 306. *See also St. Elizabeth Hospital v. NLRB*, 715 F.2d 1193, 1196 (7th Cir.1983); *St. Elizabeth Community Hospital v. NLRB*, 708 F.2d 1436, 1441–43 (9th Cir.1983).

The reasoning of these cases is applicable to the case at bar. Unlike the schools in *Catholic Bishop*, the VOA programs are not pervasively religious in character, despite their religious objectives. On the contrary, the programs function in essentially secular fashion. The VOA's reliance on *Catholic Bishop* is therefore misplaced. We conclude that the Board's exercise of jurisdiction in this case poses no "significant risk that the First Amendment will be infringed." *Catholic Bishop*, 440 U.S. at 502, 99 S.Ct. at 1319.[3]

## III.

The VOA also asserts that the Board erred in finding jurisdiction over the VOA under section 2(2) of the Act, 29 U.S.C. § 152(2). That section provides that "[t]he term 'employer' ... shall not include the United States ... or any State or political subdivision thereof ...." 29 U.S.C. § 152(2) (1976). The VOA contends that by virtue of its contractual relationships with federal and local governments in administering the programs here at issue, it is

**3.** *Espinosa v. Rusk,* 634 F.2d 477 (10th Cir.1980), *aff'd without opinion,* 456 U.S. 951, 102 S.Ct. 2025, 72 L.Ed.2d 477 (1982), cited by the VOA in support of its position, arose in a different context and does not apply here.

deprived of sufficient control over its labor relations to engage in meaningful collective bargaining. It claims, in essence, that these agencies effectively control the employment relationships in the VOA programs and thus are the true "employers" for purposes of the Act. The VOA argues that because the agencies are exempt under section 2(2) of the Act, the programs they assertedly control are likewise beyond the reach of the Board's jurisdiction.

■ This court has recognized that "[w]here a private employer who has contracted to provide services to an exempt political subdivision does not retain sufficient control over the employment relationship to engage in meaningful collective bargaining, § 2(2) deprives the Board of jurisdiction because the exempt subdivision is deemed the true employer." *Board of Trustees of Memorial Hospital v. NLRB*, 624 F.2d 177, 185 (10th Cir.1980). "Whether an employer retains sufficient control over the employment relationship is a question of fact." *R.W. Harmon & Sons, Inc. v. NLRB*, 664 F.2d 248, 251 (10th Cir.1981). We therefore will not disturb the Board's finding on this question if it is supported by substantial evidence on the record considered as a whole. *Id.*

■ The Regional Director's finding of jurisdiction in this case is fully supported by the record. The evidence indicates that the majority of the funding for the six programs in question comes from the City and County of Denver Department of Social Services (DDSS). The United Way, the United States Department of Health & Human Services, client fees, and private contributions also are financial sources. To obtain funds from the governmental agencies as well as from the United Way, the VOA acts as a private contractor. The

Regional Director described the funding process as follows:

"The agency or department makes a determination to provide a service and solicits interested organizations to submit proposals and bids for provision of the desired services. In the case of DDSS, a maximum budget is specified .... The Employer then draws up a project proposal and accompanying budget for provision of the requested services. The budget is broken down into numerous line items such as administrative costs, salaries, fringe benefits, rental, utilities, etc. If the Employer is initially selected as the entity to provide the service, further and detailed negotiation is undertaken to finalize the budget and the extent of services to be provided. All programs remain subject to audit for compliance with program and budget authorizations."

Rec., vol. III, at 671.

Pursuant to these funding contracts, the granting agencies maintain a degree of control over the VOA programs they finance. For example, the DDSS specifies the nature of the services to be performed in a given program, the clients to be admitted, the criteria to which physical facilities must conform, the minimum qualifications of certain staff members, and various administrative procedures and reporting requirements to which the VOA must adhere. Nevertheless, the essential terms and conditions of employment are fully controlled by the VOA. The VOA hires, fires, supervises, and disciplines its own employees; determines hours, work assignments, evaluations, and promotions; provides its own informal grievance procedure; and maintains its own vacation, sick leave, health care, retirement, and benefit packages.[4] *Cf. NLRB v. E.C. Atkins & Co.*, 331 U.S.

---

4. An exception to the VOA's otherwise exclusive control over the tenure of its employees arises in cases of child abuse. The record indicates that where an employee is alleged to have engaged in such conduct, the DDSS can cause his or her suspension and, depending on the outcome of the charges, ultimate termination. This relatively minor intrusion on the VOA's autonomy, however, is insufficient in itself to

preclude effective bargaining. As we have said, the absolute power to hire and fire workers is "a relevant but not essential indication of an employer-employee relationship." *R.W. Harmon & Sons, Inc. v. NLRB*, 664 F.2d 248, 251 (10th Cir.1981); *see also NLRB v. E.C. Atkins & Co.*, 331 U.S. 398, 413, 67 S.Ct. 1265, 1273, 91 L.Ed. 1563 (1947).

398, 413, 67 S.Ct. 1265, 1273, 91 L.Ed. 1563 (1947) (wages, hours and promotion most important indicia of employee-employer relationship); *Harmon,* 664 F.2d at 251 ("basic bargaining subjects" are wages, seniority, grievance procedures, vacation, insurance and retirement plans).

Although the VOA's flexibility with regard to wages and benefits undoubtedly is hampered by budget ceilings in its funding contracts, room for meaningful collective bargaining still remains. Union wage demands that exceed the appropriate budget categories of a contract can be incorporated in bids on future contracts or in requests for rebudgeting or for additional monies in present contracts. Thus, the limitations placed on the VOA by virtue of its funding process do not preclude effective bargaining, but merely "serve to define the economic framework within which the [VOA] and the Union may conclude their bargaining." *NLRB v. St. Louis Comprehensive Neighborhood Health Center, Inc.,* 633 F.2d 1268, 1271 (8th Cir.1980), *cert. denied,* 454 U.S. 819, 102 S.Ct. 99, 70 L.Ed.2d 89 (1981). In any event, "[t]he fact that these agencies place an effective ceiling upon [employee compensation] expenditures by limiting [the employer's] total budget is not the type of control over [the employer's] labor relations required to invoke the section 2(2) exemption." *NLRB v. Austin Developmental Center, Inc.,* 606 F.2d 785, 789 n. 8 (7th Cir.1979); *see also Memorial Hospital,* 624 F.2d at 186 n. 21; *Herbert Harvey, Inc. v. NLRB,* 424 F.2d 770, 778 (D.C.Cir. 1969). The jurisdictional test under section 2(2) "does not require an employer to control all terms and conditions of employment, but only enough control to bargain effectively." *Harmon,* 664 F.2d at 251. The VOA has sufficient control over its employment relationships to bargain effectively.

We have reviewed the VOA's other contentions in this matter and find them unpersuasive. We enforce in full the Board's order requiring the VOA to bargain collectively with the Union.