**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 28 1999**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ARAMARK CORPORATION,

      Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD,

      Respondent,

THE FLORIDA PUBLIC
EMPLOYEES COUNCIL 79,
AFSCME (UNION),
INTERNATIONAL UNION OF
OPERATING ENGINEERS, LOCAL
465, AFL-CIO,

      Intervenors.

No. 97-9535

No. 97-9550

---

ON PETITION FOR REVIEW AND CROSS-APPLICATION
FOR ENFORCEMENT OF AN ORDER OF
THE NATIONAL LABOR RELATIONS BOARD
(Petition Nos. 12-CA-18704 and 11-CA-17497)

---

David W. Miller, of Baker & Daniels, Indianapolis, Indiana, (Philip J. Gibbons, Jr. with him on the briefs), for Petitioner.

Howard E. Perlstein, Deputy assistant General Counsel, National Labor Relations Board, Washington, D.C., (Frederick L. Feinstein, General Counsel, Linda Sher, Associate General Counsel, and Aileen A. Armstrong, Deputy Associate General Counsel, with him on the briefs), for Respondent.

Marsha S. Berzon, Altshuler, Berzon, Nussbaum, Berzon & Rubin, San Francisco, California, (Jonathan P. Hiatt, AFL-CIO, Washington, D.C., John C. Dempsey, Larry P. Weinberg, and Margaret A. McCann, AFSCME, Washington, D. C., Richard Griffin and Helen L. Morgan, International Union of Operating Engineers, Washington, D.C., with her on the briefs), for Intervenors.

―――――――――

Before **SEYMOUR,** Chief Judge, **PORFILIO, ANDERSON, TACHA, BALDOCK, BRORBY, EBEL, KELLY, HENRY, BRISCOE, LUCERO** and **MURPHY,** Circuit Judges.

―――――――――

**MURPHY**, Circuit Judge.

―――――――――

## I. INTRODUCTION

These matters originally came before the court on the cross-petitions of Aramark Corporation (Aramark) and the National Labor Relations Board (the Board). The Board sought enforcement of two orders finding that Aramark had committed unfair labor practices when it had refused to bargain with the Florida Public Employees Council 79, AFSCME (Council 79) and the International Union of Operating Engineers, Local 465, AFL-CIO (Local 465) (collectively, the Unions). The Unions intervened to support the Board's petition. Aramark, the

employer, argued that the Board was without jurisdiction in these matters because: (1) the operations at issue are exempt from Board jurisdiction under the "political subdivision exemption"[1] to the National Labor Relations Act (the Act); and (2) Aramark's government contracts do not leave it sufficient control over its labor relations to enable it to bargain meaningfully with a labor union.

A panel of this court denied enforcement of the Board's orders. *See Aramark Corp. v. NLRB*, 156 F.3d 1087, 1098 (10th Cir. 1998). The panel began by rejecting Aramark's contention that it is an exempt political subdivision. *See id*. at 1092-95. Nevertheless, concluding it was bound by the *Memorial Hospital* line[2] of circuit precedent, the panel held that the Board lacked jurisdiction over an employer operating under a government contract unless that employer retained sufficient control over the employment relationship to engage in meaningful collective bargaining (the so-called "governmental control test"). *See id.* at 1095-98. Because the Board had not applied the governmental control test to the operations at issue here, the panel denied enforcement of the Board's orders and remanded the case to the Board for further proceedings. *See id*. at 1098.

_____

[1]Section 2(2) of the Act exempts from the Act's coverage "any State or political subdivision thereof." 29 U.S.C. § 152(2).

[2]*See Board of Trustees of Mem'l Hosp. v. NLRB*, 624 F.2d 177, 185 (10th Cir. 1980); *R.W. Harmon & Sons, Inc. v. NLRB*, 664 F.2d 248, 251 (10th Cir. 1981); *Jefferson County Community Ctr. for Developmental Disabilities, Inc. v. NLRB*, 732 F.2d 122, 126 (10th Cir. 1984); *Denver Post of Nat'l Soc'y of Volunteers of Am. v. NLRB*, 732 F.2d 769, 774 (10th Cir. 1984).

Both the Board and the Unions filed petitions for rehearing, requesting that the *en banc* court repudiate the *Memorial Hospital* line of cases. The *en banc* court ordered the cases reheard. Upon review of the Act and applicable authorities, the *en banc* court holds that the Board need not apply the governmental control test before exercising jurisdiction under § 2(2) of the Act. Accordingly, we **vacate** sections II.B. and III. of the panel opinion and **enforce** the Board's orders.[3]

## II. BACKGROUND

*A. The Evolution and Eventual Abandonment of the Governmental Control Test*

Section 2(2) of the Act exempts from Board jurisdiction "the United States or any wholly owned Government corporation, . . . or any State or political subdivision thereof." 29 U.S.C. § 152(2). By its plain terms, this exemption applies only to governmental entities. *See Teledyne Econ. Dev. v. NLRB*, 108 F.3d 56, 59 (4th Cir. 1997) ("There is nothing ambiguous about this language. By its terms, section 2(2) exempts only government entities or wholly owned government corporations from its coverage—not private entities acting as

---

[3]The *en banc* court has not reconsidered section II.A. of the panel opinion, which rejects Aramark's claim that it qualifies as a political subdivision under § 2(2) of the Act. *See Aramark Corp. v. NLRB*, 156 F.3d 1087, 1092-95 (10th Cir. 1998). That section of the opinion thus remains in effect.

-4-

contractors for the government."). Nevertheless, the Board has historically declined to assert jurisdiction over governmental contractors, if the contracting governmental entity effectively controlled the basic terms of employment. *See infra* pages 5-10 (discussing rise and fall of "intimate connection" and "governmental control" tests).

For instance, prior to 1979, the Board utilized the intimate connection test for deciding whether to assert jurisdiction over private employers who had contracted with exempt governmental entities. *See National Transp. Serv., Inc.*, 240 N.L.R.B. 565, 1979 WL 8831, at *1-*2 (discussing and overruling intimate connection test). The intimate connection test had two distinct aspects. First, the Board queried whether an "exempt [governmental] employer exercises substantial control over the services and labor relations of the nonexempt [private] contractor, so that the latter is left without sufficient autonomy over working conditions to enable it to bargain efficaciously with the union." *Rural Fire Protection Co.*, 216 N.L.R.B. 584, 1975 WL 5421, at *3. If the answer to that question was "yes," the Board would decline jurisdiction. *Id.* If the answer was "no," however, the Board would move on to examine "the relationship of the services performed [by the nonexempt private contractor] to the exempted functions of the [governmental] institution to whom they were provided." *Id.* at *4; *see also National Transportation*, 240 N.L.R.B. 565, 1979 WL 8831, at *2

(discussing *Rural Fire Protection* and describing it as a "leading case enunciating the 'intimate connection' test"). If the nonexempt employer provided services to the exempt entity which related directly to the entity's governmental purpose, the Board would decline to assert jurisdiction. *See Rural Fire Protection*, 216 N.L.R.B. 584, 1975 WL 5421, at *4 (holding that firefighting services provided by nonexempt employer to exempt city were so intimately connected to city's "municipal purposes" as to justify declination of jurisdiction). As far back as 1969, the D.C. Circuit recognized that the Board considered the intimate connection test a tool to help the Board exercise its discretion to decline jurisdiction in cases where "it believes the policies of the Act will not be effectuated by an exercise of its authority." *Herbert Harvey, Inc. v. NLRB*, 424 F.2d 770, 773-74 (D.C. Cir. 1969).

In 1979, the Board jettisoned the intimate connection test in favor of the governmental control test. *See National Transportation*, 240 N.L.R.B. 565, 1979 WL 8831, at *2. In so doing, the Board concluded that "the first aspect of the [intimate connection] test—i.e., whether the employer would be able to bargain effectively about the terms and conditions of employment of its employees—is by itself the appropriate standard for determining whether to assert jurisdiction." *Id.* Significantly, the Board characterized the intimate connection test as a tool created by the Board to help channel its discretion to decline jurisdiction under

§ 14(c)(1) of the Act.[4]  *Id.*  According to the Board, the intimate connection test had failed miserably at achieving this function.  *See id.* ("The test does not aid the Board in determining whether the assertion of jurisdiction is appropriate in a given situation; on the contrary, the attempts to define the criteria of 'intimate connection' in cases subsequent to *Rural Fire Protection . . .* only indicate the difficulties inherent in applying so vague a standard.").  In the view of the Board, the governmental control test provided "a more objective, precise, and definitive standard for determining discretionary jurisdictional issues" because it focused solely on the utility of collective bargaining in a given employment environment.  *Id.*  Accordingly, from that point forward, the Board would simply "determine whether the employer itself meets the definition of 'employer' in Section 2(2) of the Act and, if so, determine whether the employer has sufficient control over the employment conditions of its employees to enable [the employer] to bargain with a labor organization [acting] as [the employees'] representative."  *Id.* at *1.

---

[4]Section 14(c)(1) provides as follows: "The Board, in its discretion, may, by rule of decision or by published rules . . ., decline to assert jurisdiction over any labor dispute involving any class or category of employers, where, in the opinion of the Board, the effect of such labor dispute on commerce is not sufficiently substantial to warrant the exercise of its jurisdiction."  29 U.S.C. § 164(c)(1).

The Board refined and reaffirmed the governmental control test in 1986.

*See Res-Care, Inc.*, 280 N.L.R.B. 670, 1986 WL 53982, at *4-*6.  The Board

began by noting that

> In reviewing *National Transportation* and its progeny, we find
> that the Board has not set forth a clear or consistent explanation of
> the elements of effective or meaningful bargaining.  In particular, the
> decisions have failed to define (a) those areas of an employer's labor
> relations that are sufficiently important that the employer cannot
> bargain meaningfully if the exempt entity removes or severely
> restricts the employer's discretion, and (b) the circumstances under
> which the government entity will be deemed to have removed or
> severely restricted such discretion.

*Id.* at *4.  Despite this lack of clarity, the Board concluded that the governmental

control test continued to provide the best guidepost for the Board's discretionary

declinations of jurisdiction under § 14(c)(1).  *See id.* at *1 n.1, *4.[5]  Nevertheless,

---

[5]In so doing, the Board once again affirmed that the governmental control
test is not a jurisdictional element inherent in § 2(2) of the Act.  According to the
Board,

> Res-Care and our dissenting colleague both contend that we should
> base our determination on Sec. 2(2) of the Act.  We do not agree.  As
> the Board stated in *National Transportation*, our inquiry is twofold,
> i.e., "whether the employer itself meets the definition of 'employer'
> in Section 2(2) of the Act and, if so . . . whether the employer has
> sufficient control over the employment conditions of its employees to
> enable it to bargain with a labor organization as their representative."
> It is clear . . . that Res-Care itself is not a Federal Government
> agency, and is thus not exempt from our jurisdiction under Sec. 2(2)
> of the Act.  It is also clear that Res-Care employs "employees" as
> that term is defined in Sec. 2(3).  Our only inquiry, therefore, is
> whether, in exercising our discretion, we should decline to assert
> jurisdiction because of the extent to which DOL, an entity exempt

(continued...)

in an effort to refine the governmental control test, the Board held that it would decline jurisdiction whenever an employer lacked ultimate authority over "a core group of 'basic bargaining subjects.'" *Id.* at \*6. This core group specifically included employee-compensation issues such as "wages and fringe benefits." *Id.* Thus, under *Res-Care*'s refined governmental control test, the Board continued to decline jurisdiction over governmental contractors who lacked final authority over wages and benefits, even if the contractors maintained exclusive power to hire, fire, promote, and demote. *See id.*

In 1995, however, the Board overruled the governmental control test and, in *Management Training Corp.*, announced that "in determining whether the Board should assert jurisdiction, the Board will only consider whether the employer meets the definition of 'employer' under Section 2(2) of the Act, and whether such employer meets the applicable monetary jurisdictional standards." 317 N.L.R.B. 1355, 1995 WL 451936, at \*6. The Board reasoned that focusing on control over economic terms and conditions of employment under the governmental control test oversimplified the bargaining process and improperly

---

[5](...continued)
from our jurisdiction, controls the employment conditions of Res-Care's employees. We answer that question today in the affirmative on the ground that the policies of the Act would not be effectuated by our assertion of jurisdiction in this case.
*Res-Care, Inc.*, 280 N.L.R.B. 670, 1986 WL 53982, at \*1 n.1.

involved the Board in the substantive aspects of that process. *See id.* at *4-*5. In addition, the Board noted that the governmental control test led to lengthy litigation. *See id.* at *5. The Board determined that it should not "be deciding as a jurisdictional question which terms and conditions of employment are or are not essential to the bargaining process," and stated that "whether there are sufficient employment matters over which unions and employers can bargain is a question better left to the parties at the bargaining table and, ultimately, to the employee voters in each case." *Id.* at *3, *1. The Board further stated that meaningful bargaining can occur even when

> the employer's ability to respond to union demands [is] restricted by
> its contract with the exempt entity. The fact that some matters have
> to be approved by the contracting government agency does not mean
> that bargaining is meaningless; there are, after all, proposals to be
> drafted—if not in the extant contract, then in future ones—as well as
> other matters to be negotiated which do not require contractual
> approval.

*Id.* at *4.

*B. These Enforcement Proceedings*

Aramark is a Delaware corporation providing food services nationwide.[6] Aramark manages food-service operations in the Duval County School District ("School District") in Jacksonville, Florida, and at The Citadel in Charleston,

---

[6]For a detailed recitation of the facts leading up to these enforcement proceedings, *see Aramark*, 156 F.3d at 1089-92.

South Carolina. The challenged Board orders arose out of Aramark's refusal to recognize and bargain with the Unions who represent Aramark's food service employees in Duval County and at The Citadel.[7]

In July 1990, Aramark contracted with the Duval County School Board to manage all of the School District's food-service operations. Prior to this time, the School District had operated and managed its own food service program, which was staffed solely by public employees. Under the parties' contract, employees in the food service operation as of the contract date, July 1, 1990, remained employees of Duval County and retained civil-service status. The employees were in a public-sector collective-bargaining unit represented by Council 79. All food service employees hired after July 1, 1990, were Aramark employees and were not members of the public-sector collective-bargaining unit.

Since the mid-1960s, Aramark and its predecessor, ARA Services, Inc., have contracted with the State of South Carolina to provide food services at The Citadel in Charleston, South Carolina. The Citadel is a military college owned and operated by the State of South Carolina.

---

[7]This court's jurisdiction to review the Board's orders arises under subsections (e) and (f) of § 10 of the Act. *See* 29 U.S.C. § 160(e), (f) (providing that the Board may petition for enforcement, and any aggrieved person may petition for review, of any order of the Board to the court of appeals for any circuit wherein an aggrieved person resides or transacts business).

Council 79 and Local 465 each filed separate petitions with the Board, seeking to represent Aramark's food-service employees in Duval County and at The Citadel. Aramark resisted each petition, arguing that the Board lacked jurisdiction because Aramark's contracts with the School District and with The Citadel, respectively, did not give it sufficient control over the essential terms and conditions of employment to bargain meaningfully with a union. In each case, however, the Board's Regional Director concluded that the Board had jurisdiction under the *Management Training* test, as Aramark was an "employer" with the meaning of § 2(2) and met the Board's own monetary jurisdictional requirements. In each case, the Regional Director ordered an election, which both unions won. The Board in each case rejected Aramark's request to reverse the assumption of jurisdiction and election order. After Aramark refused to bargain with the duly elected unions, the Board issued an order in each case finding that Aramark had committed an unfair labor practice and ordering it to bargain. *See Aramark Corp.*, 323 N.L.R.B. 256, 1997 WL 101268 (Duval County proceedings); *Aramark Corp.*, 324 N.L.R.B. No. 10, 1997 WL 422767 (The Citadel proceedings). The cross-petitions to enforce and for review of those orders followed.

# III. ANALYSIS

This case presents the *en banc* court with a very narrow legal question: Is the *National Transportation*/*Res-Care* governmental control test a jurisdictional prerequisite mandated by § 2(2) of the Act?  Based on the plain language of § 2(2) and the substantial deference due the Board's determination of its own statutory jurisdiction,[8] this court answers the question in the negative.  In so doing, we join the Fourth and Sixth Circuits in holding that the governmental control test is not statutorily mandated[9] and repudiate contrary precedent from this circuit.[10]

In accordance with the first principle of statutory construction, this court begins its analysis with the plain language of § 2(2).  *See Bailey v. United States*, 516 U.S. 137, 144 (1995).  Section 2(2) exempts from coverage of the Act "the United States or any wholly owned Government corporation, . . . or any State or

---

[8]"The Board has initial responsibility for determining who is an employer for purposes of the Act . . . and its construction of its own statutory jurisdiction is entitled to great respect."  *Jefferson County*, 732 F.2d at 124 (citing, *inter alia*, *NLRB v. E.C. Atkins & Co.*, 331 U.S. 398, 403 (1947) and *NLRB v. Natural Gas Utility Dist.*, 402 U.S. 600, 605 (1971)).

[9]*See Pikeville United Methodist Hosp. of Ky., Inc. v. United Steelworkers of Am.*, 109 F.3d 1146, 1152-53 (6th Cir. 1997); *Teledyne Econ. Dev. v. NLRB*, 108 F.3d 56, 59 (4th Cir. 1997).

[10]*See supra* note 2 (setting forth *Memorial Hospital* line of cases).

political subdivisions thereof." 29 U.S.C. § 152(2). As aptly noted by the Fourth Circuit,

> There is nothing ambiguous about this language. By its terms, section 2(2) exempts only government entities or wholly owned government corporations from its coverage—not private entities acting as contractors for the government. When enacting section 2(2), Congress was surely aware that private employers contracted with government entities to provide needed goods and services. Congress could not have intended to compel the Board to decline jurisdiction over private employers based upon constraints that their government contracts might impose upon the collective bargaining process. If it had so intended, it would have exempted private contractors as well as governmental entities from the Act.

*Teledyne*, 108 F.3d at 59; *see also Pikeville United Methodist Hosp. of Ky., Inc. v. United Steelworkers of Am.*, 109 F.3d 1146, 1152 (6th Cir. 1997) ("[Section] 2(2) simply and straightforwardly exempts only certain named governmental units and other organizations from the reach of the NLRB.").

This court agrees with the Fourth and Sixth Circuits that the meaning of § 2(2) is plain and unambiguous. Accordingly, both the Board and this court "'must give effect to the unambiguously expressed intent of Congress.'" *Holly Farms Corp. v. NLRB*, 517 U.S. 392, 398 (1996) (quoting *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984)). Thus, because Congress has unambiguously limited the reach of the exemption in § 2(2) to governmental entities and wholly owned government corporations, this court will not extend the exemption to government contractors. *See id.* at 1401-02

-14-

(holding that exemptions from jurisdiction contained in the Act should not be "so expansively interpreted as to deny protection to workers the Act was designed to reach").

This reading of § 2(2) is entirely consistent with the Board's interpretation of the Act. As noted at length above, although the Board has historically declined to assert jurisdiction over the employees of governmental contractors, it has consistently maintained that such declinations of jurisdiction were undertaken solely as a matter of Board discretion pursuant to § 14(c)(1) of the Act.[11] *See*

---

[11]The Unions agree that, prior to *Management Training,* the Board purported to exercise its discretionary powers under § 14(c)(1) when it declined to assert jurisdiction over government contractors under the governmental control test. They vigorously contest, however, whether § 14(c)(1) actually empowers the Board to decline jurisdiction in such cases. Nevertheless, as conceded by the Unions, the resolution of that question is unnecessary to the determination of this case.

Aramark also asserts that § 14(c)(1) does not vest in the Board a grand reservoir of discretion to decline to exercise its statutory jurisdiction. Instead, according to Aramark, the legislative history of § 14(c)(1) "'establishes that the purpose of that section was to eliminate the so-called "no man's land," that category of cases involving employers doing less than a certain volume of business and over which the Board had refused to exercise jurisdiction.'" Appellant's Supplemental *en banc* Br. at 13 (quoting *National Transportation*, 240 N.L.R.B. 565, 1979 WL 8831, at *2 n.6). Thus, according to Aramark, the governmental control test could not have been based on § 14(c)(1). As the final piece of this syllogism, Aramark asserts that because the governmental control test could not legitimately be based upon § 14(c)(1), it must have been based on § 2(2) all along.

Even assuming the merits of Aramark's contentions regarding the extent of the discretion granted the Board in § 14(c)(1), Aramark's ultimate conclusion simply does not follow. In such an assumed state of affairs, it would be equally

(continued...)

-15-

*supra* Section II.A. (discussing evolution and eventual demise of governmental control test and noting Board's position that test was purely discretionary).[12]  The Board's consistent view that governmental contractors fall outside § 2(2)'s political subdivision exemption and inside that provision's definition of an

---

[11](...continued)
logical to conclude that the Board's promulgation of the governmental control test was an *ultra vires* act rather than an implicit agency interpretation of the contours of § 2(2).  This is especially true given the Board's consistent statements during the relevant period that the governmental control test was discretionary, rather than statutory, in nature.  *See supra* Section II.A.

[12]*See also Pikeville*, 109 F.3d at 1152 ("[T]he 'control' test elucidated in *Res-Care, Inc.* is only a tool previously used by the Board to define the parameters of the agency's discretionary, as opposed to statutory, jurisdiction. Only after jurisdiction pursuant to § 2(2) was established would the Board examine the control exercised by the employer over aspects of employment conditions to determine whether the NLRB would nevertheless choose to forego examination of alleged labor law violations."); *Teledyne*, 108 F.3d at 59 ("Other courts have recognized that the *Res-Care* governmental control test . . . was an exercise of the Board's discretion."); *Human Dev. Ass'n v. NLRB*, 937 F.2d 657, 660-61 (D.C. Cir. 1991) ("[The government contractor] is unquestionably an 'employer' within the statutory jurisdiction of the Board.  Based upon the exclusion of 'any State or political subdivision thereof' from the definition of an employer, however, the Board may exercise its discretion, with respect to a particular bargaining unit, not to assert jurisdiction over a statutory employer that provides services exclusively to an exempt government entity."  (citation omitted)); *NLRB v. Kemmerer Village, Inc.*, 907 F.2d 661, 663, 664 (7th Cir. 1990) (describing governmental control test as "a reasonable systematization of the Board's inherent discretion to allocate its limited resources efficiently" and as a discretionary "doctrine of prioritization" rather than a "rule of law"); *Herbert Harvey, Inc. v. NLRB*, 424 F.2d 770, 773-74 (D.C. Cir. 1969) (holding that Board clearly had statutory jurisdiction over government contractor *qua* government contractor, but noting that Board "has traditionally reserved a discretion to decline jurisdiction in particular cases where it believes the policies of the Act will not be effectuated by an exercise of its authority").

employer "is entitled to great respect." *NLRB v. Natural Gas Utility Dist.*, 402 U.S. 600, 605 (1971).[13] Based on the Act's plain language and the Board's consistent view of its statutory jurisdiction,[14] this court concludes that the governmental control test is not a prerequisite to the Board's exercise of jurisdiction over a governmental contractor pursuant to § 2(2).

The plain language of § 2(2) aside, Aramark argues that the Supreme Court incorporated the governmental control test into the Act in its decision in *NLRB v. E.C. Atkins & Co.*, 331 U.S. 398 (1947). Aramark reads far too much into the *E.C. Atkins* opinion. *See Teledyne*, 108 F.3d at 59 n.2 (rejecting notion that *E.C. Atkins* mandated governmental control test and noting that opinion instead

---

[13]*See also NLRB v. Town & Country Elec., Inc.*, 516 U.S. 85, 89-90 (1995) (holding that "the Board often possesses a degree of legal leeway when it interprets its governing statute, particularly where Congress likely intended an understanding of labor relations to guide the Act's application"); *NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 786 (1990) (holding that Congress delegated to Board "primary responsibility for developing and applying national labor policy"); *E.C. Atkins*, 331 U.S. at 414 (holding, in statutory jurisdiction case, that the "responsibility for representing the public interest in [labor] matters and of reaching a judgment after giving due weight to all the relevant factors lay[s] primarily with the Board").

[14]Because the Board has not altered its view of its statutory jurisdiction under § 2(2), but has instead reconsidered the efficacy and wisdom of declining jurisdiction over governmental contractors under § 14(c)(1), this court need not consider the amount of deference due under *Chevron* when an administrative agency alters its interpretation of a statute. *See National Fed'n of Fed. Employees v. Department of Interior*, 119 S. Ct. 1003, 1015-16 (1999) (O'Connor, J., dissenting) (arguing that agency interpretation is entitled to less deference in such situations).

"emphasized that the Board has considerable discretion in deciding whether to exercise jurisdiction over non-exempt private entities").

In *E.C. Atkins*, the Supreme Court analyzed whether the Board could validly assert jurisdiction over a bargaining unit of private guards who were employees of a governmental defense contractor, when the guards were required to be civilian auxiliaries to the United States Army military police. *See* 331 U.S. at 399. Military authorities reserved the right to veto the hiring and firing of individual guards and "were authorized to take appropriate action through the plant management to correct conditions which might result in defective or inadequate performance by the guard forces of its ordinary protective duties." *Id.* at 407 (quotations omitted).

Despite the substantial control exercised by the military over the guards, the Court affirmed the Board's exercise of jurisdiction. *See id.* As a general matter, it noted that

> [T]he terms "employee" and "employer" in this statute carry with them more than the technical and traditional common law definitions. They also draw substance from the policy and purposes of the Act, the circumstances and background of particular employment relationships, and all the hard facts of industrial life.
> And so the Board, in performing its delegated function of defining and applying these terms, must bring to its task an appreciation of economic realities, as well as a recognition of the aims which Congress sought to achieve by this statute. This does not mean that it should disregard the technical and traditional concepts of "employee" and "employer." But it is not confined to those concepts. It is free to take account of the more relevant economic

and statutory considerations.  And a determination by the Board based in whole or in part upon those considerations is entitled to great respect by a reviewing court, due to the Board's familiarity with the problems and its experience in the administration of the Act.

*Id.* at 403-04.  Applying these general precepts to the facts before it, the Court concluded that jurisdiction was appropriate even though the military, an exempt governmental entity, controlled many functions of the employment relationship. According to the Court,

In this setting, it matters not that respondent was deprived of some of the usual powers of an employer, such as the absolute power to hire and fire the guards and the absolute power to control their physical activities in the performance of their service.  Those are relevant but not exclusive indicia of an employer-employee relationship under this statute.  As we have seen, judgment as to the existence of such a relationship for purposes of this Act must be made with more than the common law concepts in mind.  That relationship may spring as readily from the power to determine the wages and hours of another, coupled with the obligation to bear the financial burden of those wages and the receipt of the benefits of the hours worked, as from the absolute power to hire and fire or the power to control all the activities of the worker.  In other words, where the conditions of the relation are such that the process of collective bargaining may appropriately be utilized as contemplated by the Act, the necessary relationship may be found to be present.

*Id.* at 413-14.

Consistent with *E.C. Atkins*, the Board's decision to abandon the governmental control test was made based on the "hard facts of [modern] industrial life" and with reference to the question whether "the process of

collective bargaining may appropriately be utilized as contemplated by the Act."

*Id.* at 403, 414. As noted by the Board,

> In retrospect, we think the emphasis in *Res-Care* on control of economic terms and conditions was an over-simplification of the bargaining process. While economic terms are certainly important aspects of the employment relationship, they are not the only subjects sought to be negotiated at the bargaining table. . . . In times of downsizing, recession, low profits, or when economic growth is uncertain or doubtful, economic gains at the bargaining table are minimal at best. Here the focus of negotiations may be upon such matters as job security, job classifications, employer flexibility in assignments, employee involvement or participation and the like.

*Management Training*, 317 N.L.R.B. 1355, 1995 WL 451936, at *4; *see also*

*Pikeville*, 109 F.3d at 1153 ("In today's labor market, the economic packages

offered to employees are no longer the sole prizes of a bargaining event.").[15] We

find no support in *E.C. Atkins* for the proposition that the *National*

*Transportation*/*Res-Care* governmental control test is a prerequisite to the

Board's exercise of jurisdiction under § 2(2).

_____

[15]For exactly these reasons, this court rejects Aramark's claim that the Board's *Management Training* test constitutes an arbitrary and capricious exercise of the Board's jurisdiction. In particular, we agree with the Fourth Circuit that for each policy argument advanced by employers in opposition to *Management Training*, there is a corresponding policy argument in favor of the approach offered by the Board. *See Teledyne*, 108 F.3d at 60. Congress left the resolution of these policy disputes to the Board, not the courts. *See Charles D. Bonanno Linen Serv., Inc. v. NLRB*, 454 U.S. 404, 418 (1982) (holding that courts must not "substitute [their] judgment for those of the Board with respect to the issues that Congress intended the Board should resolve").

As a final matter, Aramark contends that this court's *Memorial Hospital* line of cases, *see supra* note 2, was soundly decided and should guide our resolution of this appeal. As set out at some length in the panel opinion, the *Memorial Hospital* line clearly held that the governmental control test was a jurisdictional element inherent in § 2(2) of the Act. *See Aramark*, 156 F.3d at

1096-97.[16]  For those reasons set out above, this court concludes that the

*Memorial Hospital* line of cases was wrongly decided.

Furthermore, as persuasively argued by the Board, we conclude that the

*Memorial Hospital* line is founded on a mistaken failure to distinguish between

the Board's statutory and discretionary jurisdiction.  The Board is bound by its

---

[16]In its separate petition for rehearing *en banc*, the Unions argue that the panel erred when it concluded that it was bound by the *Memorial Hospital* line. According to the Unions, the panel should have applied a special rule of relaxed *stare decisis* applicable only in the administrative law context.  Under this special rule, "where an agency has articulated a new statutory interpretation, that interpretation should ordinarily be reviewed on its merits, even where the circuit has previously applied a different construction of the statute."  Intervenor's Pet. for Reh'g at 5 (citing *NLRB v. Viola Indus.-Elevator Div., Inc.*, 979 F.2d 1384, 1394 (10th Cir. 1992) (*en banc*); *Mesa Verde Constr. Co. v. Northern Cal. Dist. Council of Laborers*, 861 F.2d 1124, 1134-36 (9th Cir. 1988) (*en banc*)). Whatever the merits of such a special rule of administrative *stare decisis*, a question we need not and do not resolve here, it is inapplicable given the particular facts of this case.  As the panel noted at some length, *see Aramark*, 156 F.3d at 1096-98 & n. 15, and as conceded by the Board in its petition for rehearing *en banc*, the *Memorial Hospital* line of cases cannot reasonably be read as merely deferring to the governmental control test as simply one of a series of reasonable interpretations to which § 2(2) was susceptible.  Instead, those opinions squarely, though erroneously, hold that § 2(2) mandates the governmental control test as a prerequisite to the Board's statutory jurisdiction. *See, e.g.*, *Memorial Hospital*, 624 F.2d at 185 (holding that when a "private employer who has contracted to provide services to an exempt political subdivision does not retain sufficient control over the employment relationship to engage in meaningful collective bargaining, § 2(2) deprives the Board of jurisdiction"); *R.W. Harmon*, 664 F.2d at 251 ("Courts have interpreted section 2(2) to prohibit the Board from asserting jurisdiction over private employers . . . if the employer does not 'retain sufficient control over the employment relationship to engage in meaningful collective bargaining.'" (quoting *Memorial Hospital*, 624 F.2d at 185)).

own rules until it changes them, "including the rules that it has adopted in order to channel what would otherwise be an essentially unreviewable discretion in the deployment of its limited prosecutorial resources." *Kemmerer Village, Inc. v. NLRB*, 907 F.2d 661, 663 (7th Cir. 1990); *see also Burinskas v. NLRB*, 357 F.2d 822, 827 (D.C. Cir. 1966) (holding that Board cannot "act arbitrarily nor can it treat similar situations in dissimilar ways"). Because it had embraced the governmental control test for several decades prior to the advent of the *Memorial Hospital* line, the Board had no reason to object to the applicability of the test in any of the cases in that lineage. Accordingly, it appears that both the Board and this court focused on the applicability of the test to the facts of each particular case without repeatedly intoning the test's discretionary and potentially transitory nature. The result appears to have been a blurring of the distinction in this court's opinions.

For instance, in *Memorial Hospital*, the court held that "[t]he governmental subdivision's substantial control over the labor relations policies of the party contracting with the governmental agency **requires** the Board to **decline to assert** jurisdiction." 624 F.2d at 185 (emphasis added). While the word "requires" implies a lack of statutory jurisdiction, the term "decline to assert" implies an act of discretion. Similarly, in *R.W. Harmon*, the court cast the petitioner's claim in discretionary terms ("Petitioner . . . argues that the Board

should decline to exercise jurisdiction . . . ."), yet decided the case in terms of a statutory-jurisdictional bar ("Courts have interpreted section 2(2) to **prohibit** the Board from asserting jurisdiction . . . ."). 664 F.2d at 248 (emphasis added) (citing *Memorial Hospital*). By the time *Jefferson County* was decided, this court recognized a distinction between the Board's discretionary and statutory jurisdiction, but concluded that the distinction had been rendered meaningless by the decision in *Memorial Hospital*. *See Jefferson County*, 732 F.2d at 126.

Whatever the genesis of the *Memorial Hospital* line, this court is convinced that the entire pedigree is faulty. Accordingly, those portions of each decision in the *Memorial Hospital* line, *see supra* note 2, inconsistent with this opinion are hereby overruled.

## IV.  CONCLUSION

The orders of the Board are hereby **ENFORCED**. Aramark's petition for review is **DENIED**. Sections II.B. and III. of the panel opinion are **VACATED**.